**Affirmed and Opinion filed December 27, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00646-CV

**BRENDA PEABODY, M.D. AND ST. LUKE'S LAKESIDE HOSPITAL, LLC,**
**Appellants**

V.

**CHRISTY MANCHAC, INDIVIDUALLY, AS NEXT FRIEND OF M.M AND M.M., MINORS, AND REPRESENTATIVE OF THE ESTATE OF THAD MANCHAC, DECEDENT, PAT MANCHAC, AND PATRICIA WATSON,**
**Appellees**

## NO. 14-17-00721-CV

**CHARLES SIMS, M.D. AND GREATER HOUSTON PHYSICIAN'S MEDICAL ASSOCIATION, PLLC, Appellants**

V.

**CHRISTY MANCHAC, INDIVIDUALLY, AS NEXT FRIEND OF M.M. AND M.M., MINORS, AND REPRESENTATIVE OF THE ESTATE OF THAD MANCHAC, DECEDENT, PAT MANCHAC, AND PATRICIA WATSON,**
**Appellees**

**O P I N I O N**

This consolidated appeal involves the sufficiency of medical expert reports under the Texas Medical Liability Act (the "Act"). Christy Manchac, Individually, and as Next Friend of M.M. and M.M., Minors, and Representative of the Estate of Thad Manchac, Decedent, Pat Manchac, and Patricia Watson (collectively, "the Manchacs") brought medical malpractice claims against St. Luke's Lakeside Hospital, LLC, Brenda Peabody, M.D., Charles Sims, M.D., and Greater Houston Physician's Medical Association, PLLC (collectively, "appellants"). The Manchacs filed several expert reports criticizing the conduct of appellants. Each appellant challenged the sufficiency of the expert reports relating to each appellant's conduct and moved for dismissal of the Manchacs' claims. The trial court denied the motions to dismiss. We conclude that the expert reports provide straightforward links between the medical providers' alleged breaches of their respective standards of care and Mr. Manchac's death. Accordingly, we affirm.

*Background*

Thad Manchac, 44 years old, had lived with a bioprosthetic aortic valve for nine years, yet he was active and played basketball. He developed pneumonia in November 2015, and was hospitalized at Memorial Hermann – The Woodlands. He was treated and discharged two days later.

Mr. Manchac saw his family physician for his post-pneumonia follow-up the

2

next week. Mr. Manchac was instructed to wait two weeks before playing basketball and to return for a follow-up examination in one month. Mr. Manchac returned to his family physician in December 2015. He reported that he had played basketball twice the previous week and his shortness of breath had improved since his hospitalization. He still had a slight cough. Mr. Manchac returned to his family physician on January 8, 2016, complaining of epigastric fullness and constant pressure in his abdomen. Mr. Manchac's physician referred him to a cardiologist, Dr. Brenda Peabody, to address the epigastric discomfort.

Mr. Manchac saw Dr. Peabody ten days later to clear him for an endoscopy scheduled for February. An echo cardio exam showed a "brisk carotid upstroke and loud murmur," which were not present when she saw Mr. Manchac six months earlier. Dr. Peabody suspected a valvular dysfunction and bacterial endocarditis. A transesophageal echocardiogram ("TEE") was scheduled for January 22, 2016, at St. Luke's Lakeside Hospital.

On January 22, 2016, Dr. Peabody performed the outpatient TEE procedure on Mr. Manchac at St. Luke's. Dr. Peabody documented "severe paravalvular leak of bioprosthetic aortic valve"; "evidence of endocarditis of bioprosthetic aortic valve with mobile mass on the aortic side of the valve"; "severe jet of perivalvular aortic insufficiency"; and "premature closure of the anterior mitral valve leaflet consistent with severe AI." "AI" refers to aortic insufficiency, also known as aortic regurgitation. Dr. Peabody's diagnosis was "1) prosthetic aortic valve regurgitation and 2) endocarditis of prosthetic valve." Dr. Peabody stated in her report:

> Pt to have immediate aortic valve replacement likely to need suspension of redo valve and proximal aorta replacement. Contact with CV surgeon to be made later today and I will contact patient.

The procedure ended at 12:13 p.m. Mr. Manchac was released from St. Luke's at 1:35 p.m.

3

Three days later, Mr. Manchac saw Dr. Charles Sims, an infectious disease doctor, at Dr. Peabody's referral. Dr. Sims evaluated Mr. Manchac and concluded his condition could be "1) partially treated infectious endocarditis; 2) treated endocarditis with valvular dysfunction; 3) noninfectious valvular abnormality (but very acute); or 4) atypical bacterial disease." Dr. Sims obtained blood cultures and planned to start Mr. Manchac on antibiotics as indicated by the results and recommended that valve replacement surgery take place 30 days after the course of antibiotics was completed. No further consults or tests were ordered by Dr. Sims.

On January 27, 2016, Mr. Manchac collapsed on the floor in his home office. He had died by the time emergency responders arrived. An autopsy concluded that Mr. Manchac died of complications of aortic valve disease. An examination by Dr. Maxmillian Buja, a cardiac pathologist, showed that a calcified thrombus (blood clot) was obstructing Mr. Manchac's prosthetic aortic valve.

On January 9, 2017, the Manchacs filed suit against appellants for medical malpractice. The Manchacs served separate expert and supplemental expert reports on each appellant. *See* Tex. Civ. Prac. & Rem. Code § 74.351. Appellants objected to the respective expert reports and filed motions to dismiss. The trial court denied all the motions to dismiss. Appellants appeal from the denial of their respective motions to dismiss, complaining that the expert reports directed at their respective conduct are not sufficient to meet the requirements of section 74.351.

*Standard of Review*

We review a trial court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Samlowski v. Wooten*, 332 S.W.3d, 404, 410 (Tex. 2011). When reviewing matters committed to the trial

4

court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

*Section 74.351*

Under the Act, a claimant must serve an expert report on each defendant physician or health care provider against whom a health care liability claim is asserted not later than the 120th day after the date each defendant's original answer is filed. Tex. Civ. Prac. & Rem. Code § 74.351(a). Each defendant "whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived." *Id.*

If the claimant fails to timely serve an expert report, then on the motion of the defendant, the trial court shall dismiss the claim with respect to the defendant with prejudice and award attorney's fees. *Id.* § 74.351(b). If the motion challenges the adequacy of an otherwise timely report, the court may grant the motion "only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the [Act's] definition of an expert report." *Id.* § 74.351(l).

Under the Act, an "expert report" is:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

"[T]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." *Wright*, 79 S.W.3d

5

at 52 (internal quotation marks and citation omitted). A good faith effort means a report that includes all the required elements and explains their connection to the defendant's conduct in a non-conclusory manner. *Samlowski*, 332 S.W.3d at 410.

It is not necessary that the expert report marshal all the plaintiff's proof, but it must set forth the expert's opinion on the standard of care, breach, and, causation. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). The report must (1) inform the defendant of the specific conduct called into question; and (2) provide a basis for the trial court to conclude the claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). The plaintiff is not required to prove her claim with the expert report; the report must show that a qualified expert is of the opinion that she can. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). The purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims. *Abshire v. Christus Health Se. Tex.*, No. 17-0386, 2018 WL 6005220, at *3 (Tex. Nov. 16, 2018). A frivolous claim is not the same as an ultimately unsuccessful one.

The trial court should look no further than the expert report because all the information relevant to the inquiry is contained within the four corners of the report. *Wright*, 79 S.W.3d at 52. The Act does not require that a single expert address the standard of care, breach, and causation, and expert reports may be read together to determine whether they represent a good-faith effort to satisfy the statutory requirements. *Gannon v. Wyche*, 321 S.W.3d 881, 896 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing Tex. Civ. Prac. & Rem. Code § 74.351(i)).

The standard of care for a doctor or a health care provider is what an ordinarily prudent doctor or health care provider would do under the same or similar circumstances. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). Identifying the standard of care is essential because whether the

defendant breached the defendant's duty to a patient cannot be determined without specific information about what the defendant should have done differently. *Id.*

"To satisfy the Act's expert-report requirement, '[a]n expert must explain, based on the facts set forth in the report, how and why [a health care provider's] breach [of the standard of care] caused the injury. A bare expert opinion that the breach caused the injury will not suffice.'" *Zamarripa*, 526 S.W.3d at 459–60 (quoting *Van Ness*, 461 S.W.3d at 142). A plaintiff who cannot prove that his injury was proximately caused by the defendant's breach of the standard of care does not have a meritorious claim. *Id.* at 460. The following elements comprise proximate cause:(1) foreseeability and (2) cause-in-fact. *Id.*

## I.     ST. LUKE'S APPEAL

In their petition, the Manchacs alleged that St. Luke's nurses were negligent by (1) failing to properly educate and communicate with Mr. Manchac following his TEE procedure; (2) failing to communicate with Dr. Peabody prior to automatically discharging Mr. Manchac; (3) failing to call in a cardiovascular surgeon for an immediate consult before discharging Mr. Manchac; (4) discharging Mr. Manchac; and (5) failing to have proper discharge policies and procedures.

The Manchacs served St. Luke's with the expert reports of Nurse Kimberly Roberts[1] and Paul S. Brown, M.D., a board certified cardiothoracic surgeon.[2] St. Luke's objected that Roberts's report is insufficient as to the standard of care for nurses. St. Luke's objected to Dr. Brown's reports on the grounds that he is not qualified to render

---

[1] The Manchacs also served the expert reports of Nurse Beth Cummings. St. Luke's objected to Cummings's reports. Because we conclude that Roberts's report is adequate, we need not reach any issue concerning Cummings's reports.

[2] Dr. Brown uses the terms "cardiothoracic surgeon" and "cardiovascular surgeon" interchangeably.

expert testimony as to the standard of care for nurses and his report is insufficient as to causation. St. Luke's also moved to dismiss the Manchacs' claims because they had not served compliant expert reports before the expiration of the 120-day deadline. On July 17, 2017, the trial court denied St. Luke's objections to the expert reports of Roberts and Dr. Brown and denied its motion to dismiss.

In this appeal, St. Luke's asserts that the trial court abused its discretion in denying St. Luke's objections to the expert reports of Roberts and Dr. Brown and the motion to dismiss because the reports of both are insufficient as to the standard of care and Dr. Brown's reports are insufficient also as to his qualifications and causation.[3]

## A. Standard of Care and Breach

### 1. Nurse Roberts

St. Luke's avers that Roberts's report is insufficient as to the standard of care. Roberts set forth the relevant nursing standard of care in her report as follows:

1. Review the contents of Mr. Manchac's electronic medical chart including the procedure note, plan of care, and post-procedure instructions before considering discharging the patient;

2. Communicate with attending physician about plan of care, and serve as patient advocate to ensure the patient gets the cardiovascular consult and is admitted to the hospital.

3. Clarify with attending physician when documentation in chart states patient needs immediate surgery and a cardiovascular consult.

4. Ensure all consults have been completed before discharge of patient.

5. Ensure patient fully understands all discharge instructions, the nurse should also answer any questions the patient may have, and ensure

---

[3] St. Luke's argued in its original objections that Dr. Brown was not qualified to opine on the standard of care or causation. In its objections to Dr. Brown's supplemental report, St. Luke's argued that Dr. Brown's supplemental report was insufficient on standard of care but did not argue that he lacked qualifications.

any follow up appointments are scheduled.

Roberts opined that a prudent nurse would have read Dr. Peabody's note and asked her for an admission order and whether the cardiovascular surgeon had been contacted in accordance with her notes, given the need for the immediate aortic valve replacement. According to Roberts, if the nurse were unable to contact Dr. Peabody or if Dr. Peabody refused to admit the patient, the nurse should have attempted to use the nurse chain of command, the top of which is the medical director, who is a medical doctor and has the authority to admit patients and give orders pertaining to patients.

Roberts stated that it is within the scope of nursing practice to request consultations with physicians and the nurse could have contacted the cardiovascular surgeon on call and requested a consult and further instructions. Roberts further stated that, after reading Dr. Peabody's note, a prudent nurse would have ensured that Mr. Manchac was not discharged and the cardiovascular consult had been made. St. Luke's contends that Roberts's expert report is insufficient as to the standard of care for nurses because it requires nurses to engage improperly in the practice of medicine.[4]

The Manchacs argue that a nurse's calling a cardiovascular surgeon to see Mr. Manchac based on Dr. Peabody's note is not the practice of medicine but is merely following a case plan as a patient advocate to make sure that the patient receives the medical care directed by Dr. Peabody.

To the extent that St. Luke's argues that the expert report is insufficient because Roberts is incorrect in her conclusions about what the standard of care requires, we note that "the ultimate evidentiary value of the opinions proffered by [the experts] is a matter to be determined at summary judgment and beyond." *Abshire*, 2018 WL 6005220, at *6. At this preliminary stage, whether those standards appear reasonable

---

[4] In Texas, medical decisions are to be made by attending physicians. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 415 (Tex. App.—Fort Worth 2003, no pet.).

is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort. *Id.* The issue in this appeal is whether Roberts's conclusions regarding standard of care are sufficient; the possibility that facts may later be discovered that prove Roberts's conclusions incorrect is not a basis for holding that her expert report is insufficient under section 74.351. *See id.* We conclude that Roberts's report is sufficient as to the breach of the standard of care.

St. Luke's further asserts that Roberts's expert report relies upon conclusory statements to describe how the nurses could have averted Mr. Manchac's discharge from the hospital.[5] To the extent St. Luke's lodges a criticism of Roberts's alleged conclusions regarding causation, we conclude it immaterial, because under the Act, only physicians can render opinions as to causation. *See Zamarripa*, 526 S.W.3d at 461 n. 33 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C)).[6]

St. Luke's relies on *Zamarripa* in support of its position that Roberts misstates the standard of care. In *Zamarripa*, however, the court focused only on causation. For the causation element, we must look to Dr. Brown's report, which may be read together with Roberts's report.

---

[5] Roberts's report states:

Based on my extensive experience in urgent situations such as these, had the nursing staff informed Mr. Manchac and his wife of the urgent need to have the cardiovascular surgery consult that same day and 'immediate' heart valve replacement surgery, Mr. Manchac would have more likely than not insisted on remaining in the hospital until seen by a cardiovascular surgeon.

[6] *See also Wright*, 79 S.W.3d at 52 (holding that the court is limited to the four corners of the expert report). In its reply brief, St. Luke's claims that Roberts's expert report is insufficient on proximate cause. We do not address issues raised for the first time in a reply brief. *See* Tex. R. App. P. 38.3; *Palfreyman v. Gaconnet*, No. 14-17-00472-CV, 2018 WL 4624208, at *4 (Tex. App.— Houston [14th Dist.] Sept. 27, 2018, no pet.); *Pochron v. Olesky*, No. 14-12-00650-CV, 2014 WL 494894, at *5 (Tex. App.—Houston [14th Dist.] Feb. 6, 2014, no pet.) (mem. op.).

### 2. Dr. Brown

St. Luke's asserts that Dr. Brown did not make any statement to the effect that he is familiar with the standard of care for nurses. However, the Manchacs do not claim that they offered Dr. Brown's reports for the standard of care for hospital staff, but only as to causation. When a party alleges negligence against nursing staff, as in this case, the party may provide a fair summary of the standard of care and breach through a nurse expert while providing a fair summary of causation through a physician expert. *See Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] 2017, pet. pending). Therefore, it is not necessary that Dr. Brown opine on the standard of care applicable to nurses.

### B. Causation

Dr. Brown agreed with Roberts's opinions that Mr. Manchac's TEE results as documented by Dr. Peabody "mandated an immediate, urgent cardiothoracic surgical consult and immediate admission to in-patient care in the hospital."

Dr. Brown concluded that the breaches of the standard of care by St. Luke's, which Roberts set forth in her report, "were to a reasonable degree of medical probability, a proximate cause of Thad Manchac's death."[7] Dr. Brown opined that:

- Valvular complications such as thrombus are known and very manageable when a patient is being properly followed clinically.

- If Mr. Manchac had been informed by the hospital staff of the immediate need for surgery and a cardiothoracic surgeon had been consulted by hospital staff, the surgery would have been performed within 36 to 72 hours. Thirty-six to

---

[7] Roberts opined that the nurses breached the standard of care by failing to (1) review Mr. Manchac's electronic medical record, including Dr. Peabody's plan of care; (2) educate Mr. Manchac about the need for an immediate aortic valve replacement or the urgency for surgery; (3) read Mr. Manchac's chart before discharge; (4) use the nursing chain of command; and (5) contact the on-call cardiovascular surgeon.

seventy-two hours is sufficient time to do all necessary pre-op work, and perform the bioprosthetic aortic valve replacement.

- If a cardiothoracic surgeon had been consulted, the thrombus (blood clot) would have been removed and the valve replaced to remove this obstruction and "essentially defuse a ticking time bomb." More likely than not, Mr. Manchac, who was otherwise healthy, would have survived if he had had the surgery.

- Mr. Manchac died from an acute cardiac event when he was not in a hospital under close observation.

- If Mr. Manchac had been admitted to the hospital and released without information concerning his need for immediate surgery, he would have been closely monitored. Before any cardiac failure, there likely would have been early signs of cardiac deterioration such as arrhythmia, tachycardia, or bradycardia relating to his valve insufficiency that would have allowed for proper intervention by hospital staff to avoid death by giving vasopressors, anti-arrythmic drugs, airway management (intubation), or oxygen and, if necessary, performing emergency surgery to prevent his death within the 72-hour window to perform the surgery.

St. Luke's asserts that Dr. Brown's report does not show how intervention by the nurses would have facilitated the medical intervention that Dr. Brown opined was necessary. The Texas Supreme Court recently approved a causation opinion in a similar expert report thusly:

> In our view, [the expert doctor's] explanation provides a straightforward link between the nurses' alleged breach of the standard of care and [the patient's] injury. That is, the report draws a line directly from the nurses' failure . . . to a [proper treatment].

*Abshire*, 2018 WL 6005220, at *5. We look to the cases relied on by St. Luke's with this more recent test in mind.

In *Zamarripa*, the Supreme Court held an expert report failed to show proximate cause when it stated that the hospital, through its nurses, breached the applicable standard of care by not stopping a patient's transfer to another hospital without explaining how they could have done that or if they even had the authority to do so. *See* 526 S.W.3d at 460–61. The Court emphasized that it was the doctor who had

12

ordered the patient's transfer, not the hospital.

The Manchacs argue that *Zamarripa* is distinguishable, as Roberts explained in her report how the nurses could have stopped Mr. Manchac's discharge and had the authority to do so: by first contacting Dr. Peabody and then, if unsuccessful, using the chain of command to the medical director.

A different panel of this court concluded that we could not determine from the expert reports, without making impermissible inferences and assumptions, that the hospital's nursing staff proximately caused the appellee's injury, an amputated leg. *See Davis*, 542 S.W.3d at 24–25. In *Davis*, the nurses were criticized as in this case for allowing the patient's discharge, but the facts were importantly different: at the time she was discharged from the hospital, Ms. Davis had not shown signs of or been diagnosed with the vascular compromise that caused the later need for leg amputation. *Id.* at 15–16. Here, Dr. Peabody already had diagnosed the condition that allegedly contributed to Mr. Manchac's death, and she had recommended immediate aortic valve replacement and made a plan to inform the patient and contact a surgeon.

Yet another panel of this court distinguished both *Zamarripa* and *Davis*, stating the expert report at issue in that case "fills in the gap left out in *Zamarripa* and *Davis*." *Monga v. Perez*, No. 14-16-00961-CV, 2018 WL 505263, at *12 (Tex. App.—Houston [14th Dist.] Jan. 23, 2018, pet. denied) (mem. op.) (concluding that "it is reasonable to anticipate [primary doctor] would follow the recommendation of [consulting specialist doctor]"). *Monga* "conclude[d] that the statements [in the expert report] go beyond mere speculation or conjecture, to explain how or why [the] recommendation would have been followed." *Id.*

We conclude that Roberts's and Brown's reports, when read together, provide a fair summary of the applicable standards of care, how the experts contend the standards of care were breached, and the causal relationship between the alleged breach and the

13

injury, harm, or damages claimed. *See id.* at *1. The statements in reports go beyond mere speculation regarding the ability and authority of the nurses to prevent Mr. Manchac's discharge. Dr. Brown's explanation provides a straightforward link between the nurses' alleged breach of the standard of care and Mr. Manchac's injury. *See Abshire*, 2018 WL 6005220, at *5.

## C. Conclusion

We overrule St. Luke's issues and hold that the trial court did not abuse its discretion by overruling St. Luke's objections to the expert reports and denying its motion to dismiss.[8]

## II. DR. PEABODY'S APPEAL

In their petition, the Manchacs alleged that Dr. Peabody was negligent by her (1) failure to properly treat Mr. Manchac for his severe bioprosthetic aortic valve insufficiency; (2) failure to admit Mr. Manchac to the hospital and timely consult a cardiac surgeon; (3) delay in surgical treatment to repair Mr. Manchac's severe bioprosthetic aortic valve insufficiency; and (4) negligent cardiac treatment of Mr. Manchac that caused delay in surgical treatment.

The Manchacs served Dr. Peabody with the expert reports of Julie Anne Kovach, M.D., who is board certified in internal medicine and cardiology, and Dr. Brown, a board certified cardiothoracic surgeon, who, as addressed above, authored an expert report on the Manchacs' claims against St. Luke's. Dr. Peabody objected to Dr. Kovach's report as insufficient as to the standard of care and causation. Dr. Peabody

---

[8] The Manchacs request, in the event we that hold Roberts's and Dr. Brown's expert reports insufficient, that we remand their claims against Dr. Peabody to the trial court to consider their 30-day extension to cure deficiencies in the reports under section 74.351(c). *See* Tex. Civ. Prac. & Rem. Code § 74.351(c). Because we hold that Robert's and Dr. Brown's reports are sufficient, we do not reach the Manchacs' alternative request.

14

objected to Dr. Brown's report on the grounds that he is unqualified to opine as to the standard of care of a general cardiologist and his opinion on causation does not sufficiently explain the causal connection between the alleged breach of the standard of care and the harm. The Manchacs subsequently served Dr. Peabody with a supplemental expert report by Dr. Brown, to which Dr. Peabody again objected on the basis of Dr. Brown's alleged lack of qualifications and causation. Dr. Peabody also moved to dismiss the Manchacs' claims against her. The trial court denied Dr. Peabody's motion.

In this appeal, Dr. Peabody contends that the trial court abused its discretion by denying her motion to dismiss because the expert reports of both Dr. Kovach and Dr. Brown are insufficient as to the standard of care and causation.

## A.    Standard of Care

### 1.    Dr. Kovach

Dr. Peabody maintains that Dr. Kovach's report as to the standard of care is impermissibly vague for its failure to define what "immediate" means. Dr. Peabody, as mentioned, charted that Mr. Manchac was to have "immediate" aortic valve replacement. Dr. Kovach set forth the following standard of care:

> 1.    Dr. Peabody was required by the standard of care to admit Mr. Manchac to the hospital *on January 22, 2016* for cardiac monitoring, evaluation and treatment of possible prosthetic valve endocarditis, and *immediate* surgical evaluation for urgent valve replacement surgery based on the TEE results from that day that she interpreted as showing prosthetic aortic valve endocarditis and severe valvular regurgitation at St. Luke's Lakeside Hospital and the patient's reported symptoms of shortness of breath (congestive heart failure); and

> 2.    Dr. Peabody should have *immediately* consulted a cardiac surgeon *on January 22, 2016* so that urgent valve replacement surgery could have

15

been performed.[9]

Dr. Kovach further explained that, based on Dr. Peabody's diagnosis of prosthetic valve endocarditis with mobile mass on the prosthetic valve consistent with (thrombus) and the finding on the TEE on the afternoon of Friday, January 22, 2016, a reasonable and prudent cardiologist would have "immediately transferred" Mr. Manchac from outpatient to inpatient at the hospital.

Dr. Peabody asserts that Dr. Kovach's use of "immediate" without being more specific renders Dr. Kovach's opinion conclusory. Dr. Peabody argues that, without any specification, it is not known if "immediate" admission and surgical consult means: at that moment, within an hour, that same day, within a week, or within a month.

The Manchacs respond that, based on the common sense understanding of the English language, "immediate" means "on the same day of the TEE procedure on January 22, 2016." They point to Dr. Kovach's report, in which she stated:

> A reasonable and prudent cardiologist would have immediately transferred Mr. Manchac from the St. Luke's Lakeside Hospital outpatient department to be fully admitted to the hospital on *January 22, 2016* for consideration for urgent aortic valve replacement surgery.[10]

Dr. Kovach described what "immediate" means by stating that Mr. Manchac should have been admitted to the hospital and had a surgical consult on January 22, 2016, the day of the TEE.

Dr. Peabody contends that she had a reasonable treatment plan that did not include emergency surgery because the aortic insufficiency or regurgitation in a clinically stable patient is not an emergency. Dr. Peabody's arguments should be addressed on summary judgment or at trial rather than at the expert-report stage of the

---

[9] Emphasis added.

[10] Emphasis added.

proceeding, where we are limited to the four corners of the expert report. *See Id.* at *6. We conclude that Dr. Kovach's report is sufficient as to the alleged breach of the standard of care.

### 2.    Dr. Brown

Dr. Peabody contends that Dr. Brown's reports are insufficient as to the standard of care because he is not qualified to opine on the standard of care of a cardiologist. The Manchacs do not claim that Dr. Brown opined on the standard of care. A plaintiff may rely on more than one expert to establish cause, breach, and causation, and multiple reports may be read together to establish the statutory requirements. *See Gannon*, 321 S.W.3d at 896 ("[T]he health-care liability statutes do not require a single expert to address all liability and causation issues and the expert reports should be read together when determining whether they represent a good-faith effort to satisfy the statutory requirements."). Therefore, the Manchacs may rely on Dr. Kovach to establish the standard of care, breach, and causation and also rely on Dr. Brown to establish causation.

### B.    Causation

Dr. Peabody contends that Dr. Kovach's and Dr. Brown's expert reports as to causation are insufficient.[11]

Dr. Kovach, a cardiologist,  opined on causation as follows:

Had Dr. Peabody admitted Mr. Manchac to the hospital on the Friday afternoon of January 22, 2016 and sought an immediate, emergency cardiovascular consult, his aortic heart valve replacement surgery would have likely been completed urgently, likely within 72 hours, even under

---

[11] Dr. Kovach opined that Dr. Peabody breached the standard of care by failing to, immediately following the TEE on January 22, 2016, (1) admit Mr. Manchac to the hospital for cardiac monitoring, evaluation for a prosthetic valve endocarditis, and urgent prosthetic valve replacement surgery; and (2) seek emergency cardiac surgery consultation.

the most conservative of estimates given his TEE findings. In addition, close cardiac monitoring in the hospital would have detected any early deterioration in his clinical status that would have mandated immediate, emergency surgery, and would have permitted immediate emergency action (surgery) if abrupt deterioration had occurred.

* * *

Based on my experience following patients with bioprosthetic aortic valves and consulting with cardiovascular surgeons in this situation, as well as my understanding of the medical literature, there is a very high likelihood (and certainly more likely than not) that had Mr. Manchac undergone urgent valve replacement surgery which would have included the removal of the obstruction, he would have made a complete recovery and lived his normal life with routine cardiology follow-up as he was previously doing.

* * *

In summary, but for Dr. Peabody's breaches in the standard of care as discussed above, Mr. Manchac would not have died and would have likely lived a normal life with routine cardiac follow-up.

Dr. Brown, a cardiothoracic surgeon, opined on causation from his experience:

It is my opinion that had a cardiothoracic surgeon such as myself been consulted in Mr. Manchac's case . . . on January 22, 2016, that surgery would have been performed within approximately 36 to 72 hours. This is based on my experience as a cardiothoracic surgeon who has been consulted by physicians and hospital staff in the past in similar situations. . . . This is a very conservative estimate of the time that would have been needed to accomplish the surgery. In many instances, the bioprosthetic aortic valve replacement surgery can be done within 24 to 36 hours. This is the procedure that Mr. Manchac required based on his TEE results.

I reviewed his autopsy report and subsequent letter from Dr. Buja, a cardiovascular pathologist, who reviewed the tissue slides. The conclusion was that Mr. Manchac had a calcified thrombus that was partially obstructing his aortic valve and causing his problems. It is well known that thrombi (blood clots) are a complication that can arise with prosthetic heart valves. But this complication is manageable with proper care. The thrombus in Mr. Manchac's case eventually blocked the valve significantly enough to cause sudden cardiac failure and death. If a

18

cardiothoracic surgeon had been consulted[,] . . . this thrombus would have been removed and the valve replaced to remove this obstruction and essentially defuse the ticking time bomb. . . .

I have performed numerous aortic valve replacement procedures to correct severe aortic valve insufficiency as was seen in this case. Based on my experience, only in a very small percentage of cases are these surgeries not successful in treating the valvular insufficiency and allowing the patient to return to a normal, active lifestyle. In those situations, there are usually other co-morbidities that exist that were not found in Mr. Manchac's case.  In other words, when a patient such as Mr. Manchac[,] who is an otherwise healthy individual, undergoes an aortic valve replacement surgery, it is a successful surgery. More likely than not, in Mr. Manchac's case, had the surgery been performed, he would have survived. . . .

In my opinion as a cardiovascular surgeon who has admitted patients to the hospital pending surgery for similar valvular insufficiencies, had Mr. Manchac immediately been admitted to the hospital on January 22, 2016 . . . he would have been closely monitored on cardiac telemetry monitoring in the hospital. Before any cardiac failure, there would likely have been early signs of cardiac deterioration . . . such as arrhythmia, tachycardia, or bradycardia relating to his valve insufficiency that would have allowed for proper intervention by hospital staff to avoid death . . . . His surgery would have been performed at most 72 hours from January 22, 2016[,] if the standard of care had been met, long before his cardiac failure that occurred at home.

There is every reason to conclude that Mr. Manchac would have survived and lived a normal, active life had he been admitted to the hospital for close observation pending his heart valve replacement surgery on January 22, 2016. He was otherwise a healthy, active 44 year-old with no significant co-morbidities to complicate his surgery. . . .

Dr. Peabody asserts that the Manchacs' theory of liability—that had she admitted Mr. Manchac to the hospital and obtained a cardiovascular consultation, surgery would have been performed on Mr. Manchac as a matter of course, and the surgery would have saved his life—is based on mere speculation. She argues that Dr. Brown did not explain "how" and "why" her actions caused Mr. Manchac's death. *See Davis*, 542 S.W.3d 12, 23. Dr. Peabody relies on *Zamarripa*, discussed above, among other cases.

19

526 S.W.3d at 460. According to Dr. Peabody, just as in *Zamarripa,* where the nurses did not have the authority to prevent a transfer of the patient, she is not a surgeon and could not determine the date or time of any surgery or performed it herself. Moreover, Dr. Peabody argues that Dr. Brown does not explain how she could have controlled the course of treatment after Mr. Manchac had been transferred to a surgeon's care. Dr. Peabody maintains that Dr. Brown's reports assume, without showing, that a cardiovascular surgeon would have seen Mr. Manchac, conducted an assessment, determined that surgery was indicated and appropriate, and would have scheduled it to occur within 36 to 72 hours.

Dr. Peabody's reliance on *Zamarripa* is misplaced. The expert report in *Zamarripa* did not explain how the nurses had the authority to override the treating doctor's order to transfer the patient. Here, no one argues that Dr. Peabody did not have the authority to admit Mr. Manchac to the hospital or call a cardiovascular surgeon for a surgical consultation. Dr. Brown does not state that Dr. Peabody would have to control the surgeon or the timing of the surgery. Instead, Dr. Brown explained, from his experience as a cardiothoracic surgeon, that the surgery was necessary and the cardiothoracic surgeon would have conducted the required surgery within 36 to 72 hours.

We refer again to *Monga*, discussed above. As in *Monga*, Dr. Brown's reports conclude it is reasonable to anticipate the surgeon would follow the recommendation of Dr. Peabody for a consult and appropriate follow-up according to the standard of care for a cardiovascular surgeon. *See* 2018 WL 505263, at *12.

Dr. Peabody further argues that the assumptions by Dr. Kovach and Dr. Brown that surgery by an unknown cardiovascular surgeon would have (1) occurred in 36 to 72 hours; (2) been successful; and (3) prevented Mr. Manchac's death are conclusory because there are no facts to support their assumptions. *See Chu v. Fields*, No. 01-08-

20

00417-CV, 2009 WL 40437 (Tex. App.—Houston [1st Dist.] Jan. 8, 2009, no pet.) (mem. op.).

The Manchacs assert that Dr. Brown does not guess what a physician from his specialty might have done. He "assumes" only that the surgeon would have followed the standard of care that he also must follow.

Dr. Peabody cites *Chu* for her statement that "assumptions, conditioning an alternative outcome on the successful intervention of other, unknown physicians, is the hallmark of conclusory."

In *Chu*, the patient was seen in Dr. Chu's office, not in a hospital setting. Dr. Chu ordered an MRI. *Id.* at *1. Two days later and before the MRI was scheduled, the patient collapsed and was taken to a hospital for emergency surgery. *Id.*

According to the expert's report in *Chu*, "an immediate diagnostic evaluation" by Dr. Chu would have led to an immediate diagnosis of an unruptured intracranial aneurysm, which would have required Dr. Chu to arrange for the patient to have been immediately seen in neurosurgical consultation. *Id.* at *6. This, in turn, would have led to either an immediate craniectomy, endovascular surgery, or both, which would have allowed Fields, more likely than not, to remain stroke-free. *Id.* On appeal, our sister court concluded that the expert report was conclusory and speculative because it assumed successful future diagnosis and treatment by neurological and surgical intervention by unknown physicians. *Id.*

Here, however, we have an unnamed, but not unknown, physician. Because Mr. Manchac was in a hospital setting, the surgeon would be someone with privileges to practice medicine at St. Luke's. Dr. Peabody already had made a diagnosis. The schedule for evaluation and surgery as set out Dr. Brown's report may not be exact, but it is not speculative. It is based on his experience and the standard of care for his

21

specialty.

This case is more similar to *Christus Health Southeast Texas v. Keegan*, cited by the Manchacs. *See* No. 09-10-00480-CV, 2011 WL 3206851 (Tex. App.—Beaumont July 28, 2011, no pet.) (mem. op.). In *Keegan*, two days after the patient had a cardiac catheterization at Christus and was released, he was taken to Memorial Hermann Baptist Orange Hospital, where he was treated in the emergency room. *Id.* at *1. The patient felt light-headed and experienced a sharp pain near the catheter site. *Id.* The emergency room doctor contacted a cardiologist, who was the "cross cover physician" for the physician who had performed the catheterization. *Id.* The cardiologist agreed to accept the care of the patient at Christus. *Id.* At Christus, a CT scan revealed a hematoma. *Id.* The nursing staff contacted the cardiologist shortly after the patient arrived at Christus, and two more times after that. *Id.* The cardiologist never saw the patient, who bled to death in the hospital. *Id.* One of plaintiff's experts in *Keegan* opined that, had a timely consult been made with a physician with the appropriate qualifications for treatment of this condition, the perforation of the patient's femoral artery would have been identified and repaired timely, and the patient would not have bled to death. *Id.* at *4.

Dr. Peabody maintains that *Keegan* is distinguishable because, in *Keegan*, the expert identified the condition, identified the specific harm caused by the delay, and provided detail regarding how consulting the specific type of physician would have directly affected the outcome. Moreover, according to Dr. Peabody, the condition in *Keegan* was an ongoing situation that, if caught sooner, would have been less severe than a condition not treated. Dr. Peabody further contends that Dr. Brown identified the underlying condition and a later acute event but did link them together. Dr. Peabody states that "Dr. Brown indicates that something might have happened within a broad timeframe that could have prevented a later acute event." Dr. Peabody contends that

22

*Keegan* is a case about "speeding up treatment" of the condition for a better outcome, not a case about "casting a wide net and potentially preventing harm down the line." Also, the identification of the unknown physician was not at issue. We disagree that Dr. Peabody has distinguished *Keegan*.

We do not believe that not knowing the name of the surgeon in this case renders the opinions on causation insufficient. Dr. Brown's expert reports in this case are distinguishable from the expert report in *Chu*. Here, Dr. Brown based his opinions regarding causation on his experience as a cardiothoracic surgeon, who has been consulted by physicians in similar situations. Dr. Brown stated that 36 to 72 hours would have been sufficient time to obtain a surgical consultation, do all the necessary "pre-op workup," and perform the bioprosthetic aortic valve replacement. Dr. Brown further stated that he is familiar with the availability of cardiovascular surgeons in in a major medical center such as "Houston/The Woodlands, Texas."

Dr. Brown stated that he has performed "numerous" aortic valve replacement procedures and, based on his experience, only in a very small percentage of these cases are the surgeries not successful. In those "rare situations," there are usually other co-morbidities present, which were not found in Mr. Manchac's case. "[W]hen a patient such as Mr. Manchac who is otherwise a healthy individual, undergoes an aortic valve replacement surgery, it is a successful surgery. More likely than not, in Mr. Manchac's case, had the surgery been performed, he would have survived."

Dr. Brown also opined, as a cardiovascular surgeon who has admitted patients to the hospital pending surgery for similar valvular insufficiencies, that had Mr. Manchac been immediately admitted to the hospital on January 22, 2016, he would have been closely monitored on "cardiac telemetry monitoring in the hospital." Dr. Brown also explained that, before any cardiac failure, there likely would have been early signs of cardiac deterioration such as arrhythmia, tachycardia, or bradycardia

23

relating to his valve insufficiency that would have led to intervention by hospital staff "to avoid death" by giving vasopressors, anti-arrythmic drugs, airway management (intubation) or oxygen "and, if necessary, take Mr. Manchac back for emergency surgery to prevent his death within the 72 hours window to perform the valve replacement surgery required in Mr. Manchac's case." Dr. Brown's reports, read together with Dr. Kovach's report, provide a straightforward link between Dr. Peabody's alleged breach of the standard of care and Mr. Manchac's death. *See Abshire*, 2018 WL 6005220, at *5.

Dr. Peabody next complains that, although Dr. Brown stated that "it is well-known that thrombi (blood clots) are a known complication that can arise with prosthetic heart valves," he does not explain why she should have suspected a blood clot in light of the symptoms she charted after the TEE. Dr. Peabody contends that Dr. Brown's conclusion that the "thrombus in Mr. Manchac's case *eventually* blocked the valve significantly enough to cause sudden cardiac failure and death" is speculative.[12] Dr. Peabody argues that "eventually" is impermissibly vague and gives her no indication as to how or when she should have acted to prevent Mr. Manchac's death. Therefore, Dr. Peabody contends that the effect of the thrombus was entirely unforeseeable and the Manchacs cannot establish proximate cause.

Dr. Brown based his conclusion that the thrombus eventually caused Mr. Manchac's death upon the findings in post-mortem reports. His opinion is that Dr. Peabody should have anticipated a well-known complication of Mr. Manchac's condition and properly managed it. Dr. Kovach opined that Dr. Peabody should have immediately transferred Mr. Manchac to the hospital in-patient after the TEE for urgent aortic valve replacement surgery based on the diagnosis of prosthetic valve

---

[12] Emphasis added.

24

endocarditis with mobile mass on the prosthetic valve (consistent with thrombus) and the finding of severe aortic prosthetic valve insufficiency demonstrated by Dr. Peabody's own report following the TEE. In other words, the TEE results showed aortic insufficiency and a mobile mass, regardless of whether it was caused by a thrombus or an infection. Either cause required Dr. Peabody to admit Mr. Manchac to the hospital and seek a consultation with a cardiovascular surgeon under the standard of care set forth in Dr. Kovach's report.

Dr. Brown did not opine that Dr. Peabody should have foreseen that one unknown future day, a thrombus might injure Mr. Manchac. Instead, according to Dr. Brown, based on the TEE results, Dr. Peabody should have foreseen the immediate need for medical intervention.

Dr. Peabody also argues that Dr. Brown assumes that admission to a hospital would have led to cardiac monitoring, that such monitoring would have timely identified an emergent cardiac event, that medical personnel could have timely responded to such event, and that such timely response would have averted Mr. Manchac's death. Dr. Peabody states that Dr. Brown does not reveal his familiarity with the monitoring capabilities of the relevant facilities and relies on the actions of others. Dr. Brown opined, as a cardiovascular surgeon who has admitted patients to the hospital pending surgery for similar valvular insufficiencies, that Mr. Manchac would have been monitored if he had been admitted to the hospital. We conclude that it is reasonable to anticipate the consulting specialist doctor would comply with the standard of care to order hospital staff to monitor Mr. Manchac's cardiac condition and respond appropriately, and it is reasonable to anticipate the hospital staff would follow those orders. *See Monga*, 2018 WL 505263, at \*12.

Finally, Dr. Peabody states that Dr. Brown and Dr. Kovach acknowledge her diagnosis of infectious endocarditis but ignore the effect this diagnosis had on Dr.

25

Peabody's course of treatment for Mr. Manchac such as taking certain steps to treat the potential presence of an infection prior to surgery. Dr. Peabody's arguments relate to the merits of the Manchacs' claims, and we are limited to the four corners of the expert reports at this point. *See Wright.*, 79 S.W.3d at 52.

We conclude that Dr. Kovach's and Dr. Brown's reports are not conclusory but provide a fair summary of the relationship to the alleged breach of the standard of care by not admitting Mr. Manchac to the hospital and consulting with a cardiovascular surgeon. *See Abshire*, 2018 WL 6005220, at *5.

### C. Conclusion

We overrule Dr. Peabody's issue and hold that the trial court did not abuse its discretion by denying her motion to dismiss.[13]

## III. DR. SIMS AND GREATER HOUSTON PHYSICIAN'S MEDICAL ASSOCIATION

In their petition, the Manchacs allege that Dr. Sims, an infectious disease specialist, was negligent in the care and treatment of Mr. Manchac by his (1) failure to treat Mr. Manchac for his severe bioprosthetic aortic valve insufficiency; (2) failure to admit Mr. Manchac to the hospital and timely consult a cardiac surgeon; (3) delay of surgical treatment to repair Mr. Manchac's severe bioprosthetic aortic valve insufficiency; and (4) negligent medical treatment of Mr. Manchac, which caused a delay in surgical treatment. The Manchacs also alleged that Greater Houston Physician's Medical Association, PLLC (GHPMA) is jointly and severally liable for Dr. Sims's negligence under the doctrine of respondeat superior.

---

[13] The Manchacs request, in the event we that hold Dr. Kovach's and Dr. Brown's expert reports insufficient, that we remand their claims against Dr. Peabody to the trial court to consider their 30-day extension to cure deficiencies in the reports under section 74.351(c). *See* Tex. Civ. Prac. & Rem. Code § 74.351(c). Because we hold that Dr. Kovach's and Dr. Brown's reports are sufficient, we do not reach the Manchacs' alternative request.

The Manchacs served on Dr. Sims the expert reports of Stephen K. Felts, M.D., an infectious disease specialist, and Dr. Brown, the cardiothoracic surgeon who also provided expert reports on the Manchacs' claims against St. Luke's and Dr. Peabody. Dr. Sims objected to the adequacy of Dr. Felts's expert report as to the standard of care and causation and alleged lack of Dr. Felts's qualifications to opine as to causation. Dr. Sims also objected to the adequacy of Dr. Brown's expert report as to causation. The Manchacs subsequently served a supplemental report by Dr. Brown. Dr. Sims and GHPMA[14] objected to the sufficiency of Dr. Brown's supplemental expert report as to causation and filed a joint motion to dismiss, which the trial court denied on August 21, 2017. Dr. Sims and GHPMA (collectively, "Sims") appeal from the order denying their motion to dismiss.

In this appeal, Sims claim that the trial court abused its discretion by overruling their objections to the reports of Dr. Felts and Dr. Brown and denying their motion to dismiss because the reports are insufficient as to causation.[15]

A.     Causation

Dr. Felts opined the following on causation:[16]

Mr. Manchac's death at the age of 44 was completely preventable. . . . His autopsy and subsequent cardiac pathology findings by Dr. Buja clearly show the cause of Mr. Manchac's severe aortic prosthetic valve

---

[14] GHPMA did not file its answer until after the Manchacs had served Dr. Felts's expert report and Dr. Brown's original expert report.

[15] Dr. Felts opined that the standard of care required Dr. Sims to admit Mr. Manchac to the hospital for immediate valve replacement surgery and to consult a "cardiac surgeon" so that the surgery could be performed. Dr. Sims does not argue on appeal that Dr. Felts's report is insufficient as to the standard of care.

[16] Dr. Felts stated that Dr. Sims breached the standard of care by failing to admit Mr. Manchac to the hospital on January 25, 2016, for immediate prosthetic heart valve replacement surgery and to seek an immediate, emergency cardiac consultation.

insufficiency. The cause was a calcified thrombus attached to the aortic valve that eventually obstructed his aortic valve enough to cause sudden cardiac failure and his death. Based on my experience following patients with bioprosthetic aortic valves and consulting with cardiovascular surgeons in this situation, as well as my understanding of the medical literature, had Dr. Sims admitted Mr. Manchac to the hospital for an immediate surgical consult on January 25, 2016, the surgery could have been completed within 36 to 72 hours. Pending the surgery, he would have been monitored closely and if any sudden deterioration had occurred, emergency action including surgery could have been performed to avoid his death. He, therefore, would have made a complete recovery and lived his normal life with routine cardiology follow-up as he was previously doing. Patients with bioprosthetic aortic valves live normal lives assuming no other co-morbidities of which Mr. Manchac had none. In summary, but for Dr. Sims'[s] breaches in the standard of care as discussed above, Mr. Manchac would not have died and would have likely lived a normal life with routine cardiac follow-up.

Dr. Brown opined the following on causation:

It is my opinion that had a cardiothoracic surgeon such as myself been consulted in Mr. Manchac's case by Dr. Sims on January 25, 2016 that the patient would have been admitted immediately and a bioprosthetic replacement surgery would have been performed within approximately 36 to 72 hours. This is based on my experience as a cardiothoracic surgeon who has been consulted by physicians and hospital staff in the past in similar situations. . . . Thirty-six to seventy-two hours is a very conservative estimate of the time that would have been needed to accomplish the surgery to replace the aortic valve. In many instances, the surgery can be done within 24 to 36 hours. . . .

I reviewed the autopsy report and subsequent letter from Dr. Buja, a cardiovascular pathologist, who reviewed the tissue slides. The conclusion was that Mr. Manchac had a calcified thrombus (blood clot) that was partially obstructing his aortic valve and causing his problems. It is well known that thrombi are a complication that can arise with prosthetic heart valves. But this complication is manageable with proper care. The thrombus in Mr. Manchac's case eventually blocked the valve significantly enough to cause sudden cardiac failure and death. If a cardiothoracic surgeon had been consulted[,] . . . "this thrombus would have been removed and the valve replaced to remove this obstruction and

essentially defuse the ticking time bomb. . . .

I have performed numerous aortic valve replacement procedures to correct severe aortic valve insufficiency as was seen in this case. Based on my experience, only in a very small percentage of cases are these not successful in treating the valvular insufficiency and allowing the patient to return to a normal, active lifestyle. In those situations, there are usually other co-morbidities that exist that were not found in Mr. Manchac's case. In other words, when a patient such as Mr. Manchac[,] who is otherwise a healthy individual, undergoes an aortic valve replacement surgery, it is a successful surgery. More likely than not, in Mr. Manchac's case, had the surgery been performed, he would have survived.

In my opinion as a cardiovascular surgeon who has admitted patients to the hospital pending surgery for similar valvular insufficiencies, had Mr. Manchac immediately been admitted to the hospital on January 25, 2016[,] . . . he would have been closely monitored on cardiac telemetry monitoring in the hospital. Before any cardiac failure, there would have likely been early signs of cardiac deterioration such as arrhythmia, tachycardia, or bradycardia relating to his valve insufficiency that would have allowed for proper intervention by hospital staff to avoid death . . . . But Mr. Manchac was not in a hospital because Dr. Sims failed to admit him. So those interventions, if needed, were not immediately available to Mr. Manchac.

There is every reason to conclude that Mr. Manchac would have survived and lived a normal, active life had he been admitted to the hospital for close observation pending his heart valve replacement surgery on January 25, 2016. He was an otherwise, healthy and active 44 year-old with no significant co-morbidities to complicate his surgery.

Sims assert that Dr. Felts's and Dr. Brown's reports do not adequately describe a chain of events that begins with Dr. Sims and ends with Mr. Manchac's death. Sims state that the starting point was the TEE performed on January 22, 2016, and the end was Mr. Manchac's death on January 27, 2016. Therefore, the 72-hour window for surgery, which would have saved Mr. Manchac's life as set forth in Dr. Brown's report, would have expired around noon on January 25, 2017, the date on which Dr. Sims saw Mr. Manchac.

Sims further argue that Dr. Felts and Dr. Brown offer no factual support for their opinions that admission to the hospital would have allowed for detection of early signs of cardiac deterioration and proper intervention by hospital staff or emergency aortic valve replacement surgery within the 72-hour window. Sims assert that neither Dr. Felts nor Dr. Brown offer a factual basis that Mr. Manchac experienced any early detectable signs of cardiac deterioration. Finally, Sims posit that Dr. Felts and Dr. Brown offer no factual basis for how and why early signs of cardiac deterioration, if any, would result in emergency surgery to replace the valve.

Dr. Felts stated that the standard of care required that Mr. Manchac be admitted to the hospital by Dr. Sims on January 25, 2016, based on the TEE results showing aortic insufficiency—an insufficiency of which Dr. Sims was aware. Based on his own experience as a cardiothoracic surgeon, Dr. Brown opined that, had a cardiothoracic surgeon been consulted by Dr. Sims, Mr. Manchac would have been admitted immediately and a bioprosthetic aortic valve replacement surgery would have been performed within 36 to 72 hours. Dr. Brown agreed that the TEE results required that Mr. Manchac be admitted to the hospital for monitoring. Dr. Brown further opined that, 36 to 72 hours is a very conservative estimate of the time required to perform the surgery. In many instances, the surgery could have been done in 24 to 36 hours. Dr. Brown pointed out that Mr. Manchac died from an acute cardiac event at home, not at the hospital. Based on his experience, had Mr. Manchac been admitted to the hospital pending surgery, he would have been closely "monitored on cardiac telemetry monitoring," and prior to any cardiac failure, there likely would have been early signs of cardiac deterioration relating to Mr. Manchac's valve insufficiency that would have allowed for proper intervention, including surgery, to avoid death.

Sims contend that, although Dr. Felts and Dr. Brown opined that Mr. Manchac experienced sudden cardiac failure and death resulting from a calcified thrombus,

30

which was present at the time of the TEE and identified in the autopsy, they do not provide a factual basis to support their opinions that a progression of the aortic valve obstruction occurred during the timeframe between Dr. Sims's care and Mr. Manchac's death. *See Estorque v. Schafer*, 302 S.W.3d 19, 28 (Tex. App.—Fort Worth 2009, no pet.) (holding that the expert did not explain the basis of his opinions as to causation; his report left gaps by not explaining how or why the physicians' failure to consult a specialist caused worsening or progression of the patient's listed conditions).

We disagree that Dr. Felts and Dr. Brown were required to show that Mr. Manchac's condition worsened after he saw Dr. Sims. During Mr. Manchac's office visit, Dr. Sims noted that Mr. Manchac had "severe aortic valve insufficiency." Dr. Felts and Dr. Brown agreed that, based on the TEE results, Mr. Manchac's valve insufficiency already was severe enough to require him to be admitted to the hospital immediately for aortic valve replacement surgery.

Relying on *Chu* and *Zamarripa*, as did Dr. Peabody in her appeal, Sims contend that Dr. Felts's and Dr. Brown's reports are conclusory because they assume a timely diagnosis and successful treatment by an unknown physician. Specifically, Sims claim that Dr. Felts and Dr. Brown incorrectly assume that had Dr. Sims consulted an unknown cardiovascular surgeon, the surgeon would have (1) conducted an independent medical evaluation of Mr. Mancha and diagnosed the need for aortic valve replacement surgery; and (2) performed aortic valve surgery within the 24 to 72-hour window as being required for aortic valve surgery to prevent Mr. Manchac's death.

In *Chu* the expert report concluded that Dr. Chu's "immediate diagnostic evaluation" would have led to an immediate diagnosis of the patient's condition, an unruptured aneurysm, requiring Dr. Chu to arrange a neurosurgical consultation. 2009 WL 40437, at *6. The patient would have had an immediate craniectomy, endovascular surgery, or both, which would have resulted in the patient, more likely than not, to

remaining stroke-free. *Id.* The court held that the report was conclusory and speculative because it assumed successful diagnosis and treatment by neurological and surgical intervention. *Id.*

As with Dr. Peabody, the surgeon would be a physician with privileges to practice at St. Luke's. Therefore, the surgeon is unnamed, but not unknown as in *Chu*. Moreover, as noted above, Dr. Brown expressly based his opinions about what a cardiovascular surgeon would have done, and during what time frame, on Dr. Brown's experience as a cardiovascular surgeon, who has been consulted by physicians in the past in similar situations.

Sims posit that *Zamarripa* further demonstrates that an assumption of successful diagnosis and treatment by an unknown physician is conclusory. Sims argue that Dr. Felts and Dr. Brown assume that Dr. Sims would have had the right or the means to persuade the unknown cardiovascular surgeon to perform the aortic valve replacement surgery in a time frame that would have prevented Mr. Manchac's death. Sims' reliance on *Zamarripa* is misplaced. Sims do not argue that Dr. Sims could not have admitted Mr. Manchac to the hospital. Furthermore, as with Dr. Peabody, Dr. Brown's reports conclude that it is reasonable to anticipate that the surgeon would follow Dr. Sims's recommendation for a consult and adhere to the standard of care for a cardiovascular surgeon. *See Monga*, 2018 WL 505263, at *12.

We conclude that Dr. Felts's and Dr. Brown's reports are not conclusory but provide a fair summary on the relationship to Dr. Sims's alleged breach of the standard of care by not admitting Mr. Manchac to the hospital and consulting with a cardiovascular surgeon. *See Abshire*, 2018 WL 6005220, at *4–5 (holding that expert report, which stated that the failure to document a complete and accurate assessment resulted in a delay in proper medical care, was sufficient to link the alleged breach of the standard of care to the injury). Therefore, Dr. Felts's and Dr. Brown's reports are

sufficient on causation.

## C.    Conclusion

We overrule Sims' issues and hold that the trial court did not abuse its discretion by denying their motion to dismiss.[17]

*Conclusion*

We affirm the orders denying St. Luke's motion to dismiss, Dr. Peabody's motion to dismiss, and Dr. Sims's and GHMPA's motion to dismiss.


/s/    Martha Hill Jamison
       Justice


Panel consists of Chief Justice Frost and Justices Christopher and Jamison.

---

[17] The Manchacs request, in the event we that hold Dr. Felts's and Dr. Brown's expert reports insufficient, that we remand their claims against Sims to the trial court to consider their 30-day extension to cure deficiencies in the reports under section 74.351(c). *See* Tex. Civ. Prac. & Rem. Code § 74.351(c). Because we hold that Dr. Felts's and Dr. Brown's reports are sufficient, we do not reach the Manchacs' alternative request.