**Jess William REED, Maureen Reed, Lynn Baugh, Donna Reed, and Jennifer Reed, Appellants,**

v.

**GRANBURY HOSPITAL CORPORATION d/b/a Lake Granbury Medical Center, Appellee.**

No. 2–01–329–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 29, 2003.

Law Offices of George Parker Young, P.C., George Parker Young, Adam J. Williams, Elizabeth Sturdivant Kerr, for Appellant.

Fulbright & Jaworski L.L.P., Walter A. Herring, Richard S. Krumholz, D. Todd Smith, Dallas, for Appellee.

PANEL A: CAYCE, C.J.; DAY and LIVINGSTON, JJ.

## OPINION

JOHN CAYCE, Chief Justice.

### I. Introduction

Jess William Reed, Maureen Reed, Lynn Baugh, Donna Reed, and Jennifer Reed (collectively, the Reeds) appeal from a summary judgment for Granbury Hospital Corporation d/b/a Lake Granbury Medical Center (the Hospital) on the Reeds' medical negligence claims. In three issues, the Reeds contend the summary judgment is improper because the trial court erroneously struck their experts' testimony on the standard of care; the record contains more than a scintilla of evidence on the standard of care; and the trial court improperly struck certain testimony elicited from a Hospital nurse. Because we conclude that the trial court did not abuse its discretion by striking the experts' testimony on the standard of care, we will affirm the trial court's judgment.

## II. Background Facts

In March 1998, Jess Reed suffered stroke-like symptoms and was taken to the Hospital. Maureen Reed, a registered nurse, had recently heard on a television documentary program that the drug t-PA[1] could be used as a "clot-busting" treatment for stroke if administered within three hours after a stroke. Therefore, she chose to have her husband taken to the Hospital, which was only about ten minutes from the Reeds' Granbury home, rather than to a more distant Fort Worth hospital that the Reeds' health care plan used.

At the Hospital, Mrs. Reed told Dr. Don Davis, the emergency-room physician, that she had heard about t-PA and, "if possible, [she] wanted Jess to get this." Dr. Davis said nothing, turned around, and walked back into the emergency room. After Mr. Reed was admitted to the Hospital, he was diagnosed as having had a stroke and given a CT scan. The evidence regarding whether Mr. Reed was eligible to receive t-PA is conflicting. Although the radiologist who reviewed the CT scan initially concluded that it was negative for a brain hemorrhage, one of the Hospital's experts testified by affidavit that the CT scan revealed early signs of brain damage, which would have disqualified Mr. Reed as a t-PA candidate.

After waiting for about forty-five minutes and learning that Dr. Davis "hadn't done anything" to treat her husband, Mrs. Reed asked to have Mr. Reed transferred to Plaza Medical Center in Fort Worth while there was still time to administer t-PA. Although Mr. Reed was eventually transferred by ambulance to Plaza Medical Center, he arrived there outside the three-hour window for receiving t-PA.[2] The Reeds contend that, because he was not administered t-PA, Mr. Reed is significantly and permanently disabled from the stroke.

On the date of Mr. Reed's stroke, the Hospital had t-PA available and also had a written policy allowing its administration to cardiac patients. The Hospital did not, however, have a protocol for administering t-PA to stroke victims, and it had no written standard of care for stroke patients. Dr. Davis testified that, although he did not rely on the Hospital to advise him regarding what medical treatments were appropriate for a patient, including Mr. Reed, he did not consider administering t-PA to Mr. Reed without a Hospital protocol.

Dr. Davis believed that the Hospital lacked the medical staff (a neurologist or neurosurgeon) and equipment necessary to safely administer t-PA to stroke patients. He testified that a neurological group from Fort Worth had made a presentation to the Hospital's emergency room staff and offered to make arrangements to administer t-PA in Fort Worth to the Hospital's stroke patients should the need arise. Dr. Davis had consulted with the neurological group on several occasions, but the patients involved had never met the criteria, "time-wise or other contraindication," to be transferred to a Fort Worth hospital for t-PA administration. The record does not indicate whether Dr. Davis consulted with the neurological group concerning Mr. Reed.

## III. Procedural History

The Reeds sued the Hospital for negligence in the medical treatment Mr. Reed received; however, Dr. Davis was not

---

1. T–PA stands for tissue plasminogen activator.

2. The Reeds do not direct us to any evidence that Plaza Medical Center had a protocol for administering t-PA to stroke patients.

made a defendant. In their petition, the Reeds alleged that the Hospital was negligent in the following respects:

- failing to have adequate medical care policies with respect to the treatment and/or referral of patients with symptoms or conditions like Mr. Reed's;
- failing to disclose that t-PA was not available to treat stroke victims such as Mr. Reed;
- restricting Dr. Davis from administering t-PA for stroke;
- maintaining a defective protocol for the administration of t-PA for stroke;
- failing to have an effective medical quality assurance process that would have prevented the outcome in Mr. Reed's case.[3]

The Hospital moved for summary judgment on the Reeds' claims on the following grounds:

- the Reeds had presented no reliable scientific evidence regarding the alleged violations of the standard of care applicable to this case;
- the Reeds had presented no reliable scientific evidence of causation;
- as a matter of law, the Reeds could not recover on their theory that the Hospital prevented Dr. Davis from administering t-PA because hospitals are legally barred from practicing medicine.

The Hospital also moved to strike the affidavits and deposition testimony of Drs. Paul K. Bronston and Bruce Adornato, the Reeds' two designated expert witnesses, on grounds that Drs. Bronston and Adornato were not qualified to render expert opinions on the standard of care or causation issues and that their opinions were not

reliable under Texas Rule of Evidence 702, *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

After a hearing, the trial court ruled that the Hospital had a duty to use reasonable care in formulating the policies and procedures that governed its medical staff and nonphysician personnel and to "establish reasonable policies, procedures and protocols regarding standard of care." However, the trial court granted the Hospital's motion to strike Drs. Bronston's and Adornato's testimony on the standard of care and ruled that they could not testify on any of the standard of care issues in the case. The trial court also sustained the Hospital's objections to the testimony of Michael Lavender, R.N., a Hospital employee, regarding whether the Hospital's lack of guidelines prevented the use of t-PA on Mr. Reed.

The trial court granted the Hospital a no-evidence summary judgment on the Reeds' negligence claims because there was no evidence on the applicable standard of care. The trial court also granted the Hospital summary judgment that the Reeds could not recover based on their theory that the Hospital was liable to them because it had prevented or did not allow the administration of t-PA to stroke patients. The trial court denied the Hospital's motion to strike Drs. Bronston's and Adornato's affidavits based on *Daubert/Robinson*, the Hospital's motion to strike the doctors' testimony on causation, and the Hospital's motion for summary judgment on causation.[4]

---

**3.** The Reeds also alleged that the Hospital was vicariously liable under various agency and respondeat superior theories, but the trial court granted the Hospital summary judg-

ment on those claims, and the Reeds do not challenge that ruling on appeal.

**4.** The trial court did not initially rule on the causation ground in the Hospital's summary

## IV. Standard of Care

In their first and second issues, the Reeds assert that the trial court abused its discretion by striking their experts' testimony on the standard of care because the experts were qualified to render opinions on this issue and their testimony was reliable. The Reeds further contend that the trial court erred in granting the Hospital summary judgment because there is more than a scintilla of evidence on the standard of care.

### A. Establishing the Standard

■ A hospital may be liable for injuries arising from the negligent performance of a duty that the hospital owes directly to a patient. *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.-Fort Worth 1997, pet. denied). One such duty is the duty to use reasonable care in formulating the policies and procedures that govern the hospital's medical staff and nonphysician personnel. *Id.* Before a fact finder can consider whether a hospital's deviation from the standard of care is negligent, however, the plaintiff must first establish what the standard of care is. *Id.; Johnson v. Berg*, 848 S.W.2d 345, 348 (Tex.App.-Amarillo 1993, no writ); *Coan v. Winters*, 646 S.W.2d 655, 657 (Tex. App.-Fort Worth 1983, writ ref'd n.r.e.); RICHARD L. GRIFFITH & DEWEY W. JOHNSTON, TEXAS HOSPITAL LAW: LIABILITY & DAMAGES § 3.1.1 at 3–3 (3rd ed.2003).

■ The test used to determine the standard of care a hospital is required to use in formulating its policies and procedures is what a hospital of ordinary prudence would have done under the same or similar circumstances. *LaCroix*, 947 S.W.2d at 950; TEXAS HOSPITAL LAW: LIABILITY & DAMAGES § 3.1.1 at 3–3. Circum-stances to be considered include, but are not limited to, the expertise of and means available to the hospital and the state of medical knowledge. *Hood v. Phillips*, 554 S.W.2d 160, 165 (Tex.1977). Expert testimony is generally required to establish the governing standard of care and to determine whether the standard has been breached. *Id.* at 165–66; *LaCroix*, 947 S.W.2d at 950. While the standard of administrative care at a hospital may be established by lay testimony, medical expert testimony is required where, as here, the underlying issue involves the performance of medical procedures. *LaCroix*, 947 S.W.2d at 950–51; TEXAS HOSPITAL LAW: LIABILITY & DAMAGES § 3.1.2 at 3–5.

■ There are certain standards universally regarded as ordinary medical standards beneath which no common or community standards may fall. *Webb v. Jorns*, 488 S.W.2d 407, 411 (Tex.1972). This is because universality of education, training, testing, and travel in the realm of medical treatment have produced a correspondent right to expect the same basic quality of care from region to region. *Hall v. Huff*, 957 S.W.2d 90, 101 (Tex. App.-Texarkana 1997, pet. denied). These universal standards apply to multiple schools of practice and to any medical doctor. *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

### B. Qualifying the Expert

■ The rules of evidence provide that one qualified as an expert by "knowledge, skill, experience, training, or education" may testify in a case where specialized knowledge will assist the fact finder. TEX.R. EVID. 702. A two-part test governs whether expert testimony is admissible:

judgment motion. The trial court's final judgment incorporated the partial summary judg-ment, however, and ruled that "[a]ll relief not expressly granted herein is denied."

(1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex.2002); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). Whether an expert is qualified under Rule 702 is a preliminary question to be decided by the trial court, and the party offering the expert's testimony bears the burden of proving the witness's qualifications. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex.1998); *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996).

■■■■ In deciding whether an expert is qualified, the trial court "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Helena Chem. Co.*, 47 S.W.3d at 499 (quoting *Broders*, 924 S.W.2d at 152). General experience in a specialized field is insufficient to qualify a witness as an expert. *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 506 (Tex.App.-Fort Worth 2001, pet. denied). "What is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders*, 924 S.W.2d at 153.

The trial court has broad discretion to determine admissibility, and we will not reverse the trial court's ruling absent a clear abuse of that discretion. *Exxon Pipeline Co.*, 88 S.W.3d at 629; *Helena Chem. Co.*, 47 S.W.3d at 499; *Broders*, 924 S.W.2d at 151. A trial court abuses its discretion only if it acts arbitrarily and capriciously, without reference to any guiding rules or principles. *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 242.

## C. Dr. Bronston's Qualifications

■■■■ In this case, the specific issue before the trial court was whether Drs. Bronston and Adornato were qualified to opine about whether a hospital of ordinary prudence with the Hospital's capabilities would have had a protocol in place concerning the administration of t-PA to stroke patients and, if so, whether the doctors' opinions were reliable.

The record shows that Dr. Bronston was board-certified in emergency medicine, which he had practiced since 1987, and that he had been on the emergency medical staff at two Los Angeles-area hospitals since 1995. He was also a contributing author to a textbook on managed care in emergency medicine entitled *Emergency Medicine Risk Management*. He saw at least fifty stroke patients annually and administered t-PA to those whose conditions qualified them for it. Based on these qualifications, Dr. Bronston opined that "it was and is the obligation, good practice, and the standard of care for physicians and hospitals to facilitate the opportunity" for qualified stroke patients to receive t-PA treatment.

Dr. Bronston's own testimony established, however, that despite his expertise as an emergency room physician, his knowledge of hospital policies and procedures concerning the administration of t-PA to stroke patients was virtually nonexistent. His deposition testimony demonstrated only that he was familiar with the protocols for the administration of t-PA to stroke patients in the two hospitals where

he practiced. There is no evidence in either Dr. Bronston's affidavit or his deposition testimony that he knew what any other hospital's protocols were concerning the administration of t-PA to stroke patients, whether in California, Texas, or elsewhere in the United States.

Further, the record shows that Dr. Bronston merely considered himself qualified to testify concerning the standard of care applicable to a physician. When asked during his deposition about his expertise, he stated that he considered himself an expert "[a]s far as what's needed as the appropriate expertise *for an emergency room physician*.... [A]s far as what's required for the standard of care for an emergency room *doctor*." [Emphasis supplied.] Likewise, in his affidavit, Dr. Bronston stated:

> Based on my education, training, and experience, I am familiar with and qualified to offer an opinion regarding the standard of care for *treating* acute stroke patients who presented to an emergency room in March of 1998 within three hours of the onset of their symptoms, and with no counter-indications, as happened in Jess Reed's case. [Emphasis supplied.]

At most, Dr. Bronston's qualifications and testimony demonstrate that he was qualified to give an expert opinion concerning the standard of care applicable to a physician's decision of whether to administer t-PA to a stroke patient. The record does not show that Dr. Bronston possessed any special knowledge about what protocols, policies, or procedures a hospital of ordinary prudence, with the Hospital's capabilities, would have had in place. *See Gammill*, 972 S.W.2d at 718–19; *JCPenney Life Ins. Co. v. Baker*, 33 S.W.3d 417, 426 (Tex.App.-Fort Worth 2000, no pet.) (both holding that offering party must demonstrate that expert witness possesses special knowledge on the precise matter about which he is called to testify). Accordingly, the trial court did not abuse its discretion by concluding that Dr. Bronston was not qualified by knowledge, skill, training, or experience to testify about the standard of care applicable to the Hospital in this case. *See Broders*, 924 S.W.2d at 153–54.

### D. Dr. Adornato's Qualifications

■ Dr. Adornato, a neurologist, had thirty years' experience treating stroke patients. He testified that he was an expert in t-PA therapy because he knew the literature, understood t-PA and its inclusions and exclusions, and was competent to administer it. He estimated seeing one hundred stroke patients per year, one to two percent of whom he referred for t-PA administration. He also reported providing consultation to other physicians concerning whether their stroke patients were candidates for t-PA. Further, he testified that he was familiar with and qualified to offer an opinion regarding the standard of care for *treating* acute stroke patients in March of 1998. Dr. Adornato also had some experience in developing hospital protocols. Although he had not developed a t-PA protocol, he had participated in the creation of a hospital protocol in stroke pathways, which, according to him, was an area similar to t-PA therapy.

Based on his knowledge, training, and experience, Dr. Adornato opined that, in March of 1998, "every hospital that ha[d] a functioning CT scanner and an emergency room with 24–hour-a-day emergency care should have [had] a TPA protocol in place" permitting physicians to administer t-PA to patients who presented with acute stroke, even if the facility did not have a neurosurgeon or neurologist on staff. Like Dr. Bronston, however, Dr. Adornato demonstrated a complete absence of famil-

iarity with hospital protocols for the administration of t-PA to stroke patients, with the possible exception of the hospitals in which he practiced.

In March 1998, Dr. Adornato was on staff at four hospitals: Stanford Medical Center, the Palo Alto Veterans Administration Hospital, and two hospitals in the San Francisco area. He did not testify that any of these hospitals had t-PA protocols in place at that time. Indeed, Dr. Adornato admitted having no knowledge concerning how common hospital t-PA protocols were for stroke patients. Even by the date of his deposition in December 2000, Dr. Adornato had not conducted any type of survey to determine how many hospitals in the State of California had t-PA protocols for stroke. He was not even certain whether the VA hospital where he practiced had such a protocol. As was the case with Dr. Bronston, there is no evidence that Dr. Adornato possessed any special knowledge about what protocols, policies, or procedures a hospital of ordinary prudence, with a CT scanner and 24 hour emergency service, would have had in place—whether in California, Texas, or elsewhere in the United States. *See Gammill*, 972 S.W.2d at 718–19; *JCPenney Life Ins. Co.*, 33 S.W.3d at 426. Thus, the trial court did not abuse its discretion by concluding that Dr. Adornato was not qualified to testify about the standard of care applicable to the Hospital in this case. *See Broders*, 924 S.W.2d at 153–54.

The cases on which the Reeds rely are not on point. In *JCPenney Life Insurance Co.*, the expert internist demonstrated that he was qualified, based on his knowledge and years of experience, to opine about whether the decedent had died from coronary artery disease. 33 S.W.3d at 426–27. The expert neurologist in *Blan* demonstrated both that he was qualified to opine regarding the standard of care applicable to the treatment of stroke patients and that a common standard applied regardless of whether the treating physician was a neurologist, a cardiologist, or an emergency room physician. 7 S.W.3d at 746–47; *see also Keo v. Vu*, 76 S.W.3d 725, 732 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (holding that, if subject matter is common to and equally recognized in all fields of practice, any physician familiar with the subject may testify regarding the standard of care).

Here, neither Dr. Bronston nor Dr. Adornato demonstrated having knowledge or experience that would have qualified them to opine concerning whether a hospital of ordinary prudence with the Hospital's capabilities would have had a t-PA protocol for stroke in March 1998. In addition, there has been no showing that a common or universal standard of care for administering t-PA to stroke patients applied to both physicians and hospitals, or even to all hospitals.[5]

The Reeds contend that Drs. Bronston and Adornato demonstrated their familiarity with the standard of care under the

---

**5.** Indeed, the record shows quite the opposite. While there is evidence that the hospitals at which Drs. Bronston and Adornato practiced had t-PA protocols in place *by the date of the doctors' depositions*, there is no evidence that any other hospitals in California had such protocols. Further, there is evidence that few hospitals in North Texas had protocols in place in March 1998 governing the administration of t-PA to stroke patients. Dr. R. Lynn

Rea, one of the Hospital's experts, conducted a survey which showed that, in March 1998, only two of seventeen hospitals in and around North Texas had adopted such protocols. Both of these hospitals were in Dallas. By contrast, hospitals in Waxahachie, Irving, Richardson, Weatherford, Plano, Stephenville, Kaufman, Decatur, and Paris, Texas had no t-PA protocols for stroke patients.

"same or similar circumstances" as those at the Hospital because they opined that any hospital equipped with a CT scanner, as the Hospital was, should have had a t-PA protocol in place for stroke patients. *See Hall*, 957 S.W.2d at 100–01 (holding that expert was qualified to testify regarding standard of care where he professed familiarity with standard "under same or similar circumstances" and record contained no evidence of nonuniversal standard of care). We disagree. Drs. Bronston's and Adornato's testimony demonstrated that they were *not* familiar with what a hospital of ordinary prudence so equipped would have done; instead they had simply formed opinions, despite their limited knowledge of hospital protocols, policies, or procedures, about what they thought the standard of care should be.[6]

For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion by striking Drs. Bronston's and Adornato's testimony on the standard of care. We overrule the Reeds' first issue.

### E. Other Evidence

■ The Reeds contend that, even without their experts' testimony on the standard of care, there is some evidence of the standard of care hospitals are required to use in formulating protocols, policies, or procedures for treating stroke patients. The Reeds assert that the Hospital's policy and procedure on the scope of services to be provided by its emergency department, its performance improvement plan, and its representations to the community are some evidence that the standard of care was to have at least a written protocol in place for treating stroke patients. The Reeds also contend that the testimony of the Hospital's resource management director was more than a scintilla of evidence of the standard of care.

■ While a hospital's internal policies and procedures do not, alone, determine the standard of care, they may be considered in determining that standard. *LaCroix*, 947 S.W.2d at 951; *accord Fence v. Hospice in the Pines*, 4 S.W.3d 476, 481 (Tex.App.-Beaumont 1999, pet. denied); *McCombs v. Children's Med. Ctr.*, 1 S.W.3d 256, 259 (Tex.App.-Texarkana 1999, pet. denied). The policies at issue here, however, are not evidence of the standard of care asserted by the Reeds.

The emergency department policy and procedure simply stated that the Hospital would provide emergency services for "major emergencies," including stroke. The Hospital's performance improvement plan directed the Hospital to monitor the appropriateness of patient care relevant to a patient's needs, "given the current state of knowledge." In an advertisement, the Hospital stated that it had become a mem-

---

6. The dissent states that "medical expert testimony of the very type excluded by this trial court was admitted" in *LaCroix* and that Drs. Bronston and Adornato were "by definition" qualified to testify concerning the standard of care applicable to a hospital because they were qualified to testify concerning causation. Dissent at 416. The expert testimony admitted in *LaCroix* was offered to prove distinct standards of care applicable to anesthesiologists and to hospitals. Unlike this case, the standard of care for *the hospital* in *LaCroix* was established by qualified expert testimony specifically showing what a hospital of ordi-

nary prudence would have done under the same or similar circumstances. *See LaCroix*, 947 S.W.2d at 953–54. Neither of the Reeds' experts demonstrated having any knowledge or experience that would have qualified him to give an opinion regarding the protocol a hospital of ordinary prudence would have had in place for stroke victims at the time Mr. Reed was under the Hospital's care. The mere fact the experts may have been qualified to give testimony on the cause of Mr. Reed's injury does not, of course, qualify them to testify about the standard of care applicable to hospitals, as the dissent suggests.

ber of Community Health Systems because membership in this healthcare company would provide the Hospital support "to build a stronger hospital" that could compete against larger regional facilities. The advertisement also stated the Hospital's "vigorous commitment to the best in medical equipment, services and support."

Nothing in these broad policies and statements evidences a standard of care requiring a written protocol for the treatment of stroke victims. In addition, without medical expert testimony, there is no evidence of what the "current state of medical knowledge" was in March 1998.

The Reeds' reliance on our opinion in *LaCroix* is misplaced. In that case, the hospital had in place a specific policy that required an anesthesiologist to supervise the administration of anesthesia by a certified registered nurse anesthetist (CRNA). 947 S.W.2d at 951. An anesthesiologist testified that this policy met the standard of care for the administration of anesthesia, but the evidence showed that the hospital had violated its policy by not requiring an anesthesiologist to supervise the CRNA's administration of anesthesia to the plaintiff. *Id.* at 954. Here, the Hospital had no policy requiring it to adopt a written protocol for the treatment of stroke patients, nor was there any medical expert testimony stating that having such a protocol was the standard of care. There is no evidence that the Hospital's resource management director was a physician; therefore, her testimony is not evidence of the standard of care. *See id.* at 950–51 (stating the medical expert testimony is required to establish standard of care

for matters involving the performance of medical procedures).

The Reeds also contend, without giving any specifics, that Dr. Davis's testimony is some evidence of the standard of care. We find nothing in Dr. Davis's affidavit or deposition testimony about the standard of care applicable to hospitals, and the Reeds do not direct us to any such evidence.

In summary, there is no evidence in the record concerning what standard of care applied to the Hospital in the formulation of its protocols, policies, or procedures for the treatment of stroke patients. Therefore, the trial court did not abuse its discretion by granting summary judgment for the Hospital on the Reeds' negligence claims on the basis that there was no evidence of the standard of care. *See* TEX.R. CIV. P. 166a(i); *S.W. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002) (both providing that no-evidence summary judgment is proper when there is no evidence to support an essential element of the nonmovant's claim). We overrule the Reeds' second issue.[7]

### F. Nurse Lavender's Testimony

In their third issue, the Reeds complain that the trial court improperly struck the testimony of a Michael Lavender, a Hospital nurse, that the Hospital's lack of a t-PA protocol for stroke prevented the use of t-PA for stroke patients. The Reeds contend that the Hospital was negligent because its lack of a t-PA protocol for stroke constituted a "de facto" policy that prevented the administration of t-PA to stroke patients. The Reeds state, however, that Lavender's testimony was not offered to show the standard of care.

---

7. In light of our holdings with regard to the Reeds' first two issues, we need not consider the Reeds' arguments that their experts' testimony was reliable or that the summary judgment evidence raised a fact issue concerning whether the Hospital had breached the standard of care. *See* TEX.R.APP. P. 47.1 (providing that appellate court need only address every issue necessary to the disposition of the appeal).

Because there is no other evidence of what standard of care should be applied to the Hospital in the formulation of its policies, Lavender's testimony, even if competent, would not have precluded summary judgment for the Hospital on the Reeds' negligence claims.

 In Texas, medical decisions are to be made by attending physicians. *See Boney v. Mother Frances Hosp.*, 880 S.W.2d 140, 144 (Tex.App.-Tyler 1994, writ denied). A hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions. *Spinks v. Brown*, 103 S.W.3d 452, 456 n. 4 (Tex.App.-San Antonio 2002, pet. denied); *see also* TEX. OCC.CODE ANN. § 151.002(a)(13) (Vernon 2003) (defining "practicing medicine" as the diagnosis, treatment, or offer to treat a physical disease, disorder, or injury by a licensed physician or surgeon); *id.* §§ 155.001, .003 (prohibiting a person from practicing medicine without a license and providing no means by which a hospital can become licensed).

The Hospital's medical expert testified by affidavit that the decision whether to administer t-PA to a stroke patient is a medical decision made only by a physician. Dr. Bronston testified similarly.[8] Because the summary judgment evidence shows that the decision whether to administer t-PA to Mr. Reed was one that only a physician could have made, the trial court did not abuse its discretion in striking Lavender's testimony, and summary judgment for the Hospital on the Reeds' prevention by de facto policy theory was proper. *See Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999) (holding that defendant is entitled to traditional summary judgment where evidence establishes, as a matter of law, that at least one element of plaintiff's cause of action cannot be established). We overrule the Reeds' third issue.

## V. Conclusion

Having overruled all of the Reeds' issues on appeal, we affirm the trial court's judgment.

LIVINGSTON, J. filed a dissenting opinion.

TERRIE LIVINGSTON, Justice, dissenting.

I respectfully dissent from the majority's opinion that there was either no evidence to establish whether the Hospital should have had a t-PA protocol in 1998 and whether the lack of such a protocol might have prevented its use for Mr. Reed, or insufficient evidence to at least create a fact issue, rendering summary judgment inappropriate. I disagree with the majority's determination that the trial court's decision to exclude two of the appellants' experts on the appropriate standard of care for a hospital regarding t-PA was not an abuse of discretion.

In its opinion the majority acknowledges this own court's opinion in *LaCroix* as our guide in determining what duties a hospital may have directly to a patient. *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex.App.-Fort Worth 1997, pet. denied). In that opinion, we held that a hospital has a duty to use reasonable care in formulating the policies and procedures that govern a hospital's medical staff and

---

8. Dr. Bronston testified that a physician who deemed t-PA necessary or appropriate for a stroke patient could administer the drug even without a hospital protocol, because "just not necessarily having a protocol doesn't mean that you can't practice medicine." The trial court properly considered this testimony because the court struck only Dr. Bronston's testimony on the standard of care.

nonphysician personnel. *Id.* To determine whether a hospital has deviated from its duty, we must determine whether a hospital deviated from the standard of care to a degree that constitutes negligence. *Id.* "While the standard of administrative care at a hospital may be established by lay testimony, expert testimony is required when the underlying issue involves the performance of medical procedures." *Id.* at 950–51.

In the *LaCroix* case, medical expert testimony of the very type excluded by this trial court was admitted. There, however, it was the hospital's failure to follow its own policies and procedures as opposed to failing to even have a policy or procedure, as is the case here. Maj. Op. at 413. This distinction is of no significance. Testimony was clear that there were only two requirements for providing t-PA as a potential treatment: a functioning CT scanner and the medicine itself. This hospital had both. The appellants' two experts, who were sufficiently qualified to testify as to causation, were, by definition, then qualified to testify to appropriate hospital policy: if there is no hospital policy in place to accommodate (or even prevent) a medical doctor from acting in conformity with the current *medical* standard of care, surely the patient has presented enough evidence to show that the *hospital* standard of care has not been met. Interestingly, the majority accuses the appellants of failing to provide *hospital* expert testimony regarding the *medical* standard of care, and failing to provide *medical* expert testimony for opinions on *hospital* policies. Maj. Op. at 412, 413. Therefore, I would conclude and hold that the appellants' experts should not have been struck as to standard of care, and the trial court should not have granted the no-evidence motion for summary judgment and resulting final summary judgment.

For these reasons, I believe the judgment should be reversed and the cause remanded for trial.