

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00190-CV

———————————————

COLUMBIA MEDICAL CENTER OF ARLINGTON SUBSIDIARY, L.P. D/B/A
MEDICAL CITY ARLINGTON; AND HCA, INC. D/B/A HCA HEALTHCARE,
Appellants

V.

J.B., JR., INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF
I.B., DECEASED, AND NEXT FRIEND OF J.B. AND L.B., MINORS, Appellee

———————————————

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-312807-19

———————————————

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

In this healthcare-liability case, a hospital and another healthcare-related company appeal the trial court's refusal to dismiss, based on an allegedly defective expert report, the plaintiff's medical-negligence claims against them. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (the Texas Medical Liability Act, or TMLA). Raising two substantive issues,[1] Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a Medical City Arlington and HCA, Inc. d/b/a HCA Healthcare (collectively, the Hospital) argue that (1) the plaintiff's medical expert lacked the requisite qualifications to opine on standards of care for hospital policies and procedures or gave only conclusory statements about his qualifications, and was also unqualified to opine on causation; and, alternatively, (2) the expert's opinions about the Hospital's breach of the allegedly applicable standards of care and about causation were conclusory and did not represent a good-faith effort to comply with the TMLA's requirements. *See id.* § 74.351. We will reverse and remand to the trial court for further proceedings.

---

[1]A third issue argues simply that if we reverse as to Medical City, we should reverse as to HCA on the same bases.

# I. Background

In February 2018, 35-year-old I.B. ("Irene") fainted in a stairwell and was taken by ambulance to the Hospital.[2] She presented with symptoms consistent with a pulmonary embolism (a blood clot in the lungs): chest pain, shortness of breath, and severe syncope (fainting). An emergency-room doctor charted a primary impression that Irene had suffered a heart attack, and she was admitted to the Hospital with that presumptive diagnosis. A cardiologist performed a heart catheterization that showed small plaque to the left anterior descending artery and diagnosed Irene with mild mid-LAD plaque and atherosclerotic artery disease, with discharge set for the next day. Irene was discharged in stable cardiac condition and was instructed to follow up in two weeks with the cardiologist. Irene was never screened for a possible pulmonary embolism.

Three days after she went home, Irene was found lying in bed and struggling to breathe. Once again returning to the Hospital by ambulance, Irene arrived pale, unresponsive, and in severe respiratory distress. Despite intubation and resuscitation efforts, Irene died the same day. An autopsy showed that Irene had "massive bilateral

---

[2]The facts recited accord with those alleged in the petition and in the expert report. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 221 n.1 (Tex. 2018). We use initials and aliases for the plaintiff's side because Irene's minor children are involved in this case.

pulmonary thromboemboli."[3] The cause of death was ruled as pulmonary thromboemboli as well as atherosclerotic coronary-artery disease.

Irene's husband, J.B. ("Joseph"), individually and as Irene's estate representative and on behalf of the couple's two minor children, sued three treating physicians and their respective practice groups, as well as the Hospital—Medical City Arlington and HCA[4]—for negligence.

Joseph timely served the Hospital with an expert report prepared by Dr. Cam Patterson, a cardiologist, along with Dr. Patterson's curriculum vitae.[5] *See id.* § 74.351(a). Among other things, Dr. Patterson opined that hospitals must have policies, procedures, and guidelines in place to "ensure that patients presenting with chest pain, shortness of breath[,] and severe syncope are properly evaluated, assessed,

---

[3]"Massive pulmonary embolism is defined as obstruction of the pulmonary arterial tree that exceeds 50% of the cross-sectional area, causing acute and severe cardiopulmonary failure from right ventricular overload." Alireza Sadeghi et al, Case Report, *Acute Massive Pulmonary Embolism: Role of the Cardiac Surgeon*, 32 Tex. Heart Inst. J. 430, 430 (2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1336727/pdf/20050900s00039p430.pdf (last visited Nov. 1, 2021).

[4]Although the petition does not say so, HCA and Medical City Arlington appear to be related entities. Joseph lodged identical allegations against both of them, and HCA joined in Medical City's objections to Joseph's Chapter 74 reports and motion to dismiss. But in that joinder, HCA did "not concede that it owned or operated Medical City Arlington, employed, controlled[,] or otherwise held out any health care provider as its agent, nor that HCA Inc. provided care to" Irene. The exact relationship between the two appellees is irrelevant to our analysis.

[5]Joseph served two other expert reports, but Dr. Patterson's was the only one that related to the Hospital.

4

tested, treated[,] and diagnosed" and must also have "appropriate clinical pathways to ensure appropriate testing is conducted to rule out medical emergencies, such as pulmonary embolism." Dr. Patterson described what he called a necessary "triple rule out" protocol (as part of safety-based Joint Commission accrediting standards) to "exclude acute coronary syndrome, pulmonary embolus[,] and aortic dissection" for patients like Irene who present with cardiac abnormalities. Dr. Patterson described the "triple rule out" protocol as requiring "either a series of test[s] or specific protocol to perform imaging studies to include or exclude pulmonary embolism as a diagnosis, such as a protocol for performing CT angiogram, which is a triple rule out study." Dr. Patterson additionally opined that Medical City Arlington violated the standard of care by "[a]llowing a patient with [Irene's] clinical presentation and biomarkers to be treated and discharged with unexplained etiology [that is, an unexplained cause], without appropriate directives for close follow-up," and by failing to "have and/or enforce proper guidelines, protocols[,] and procedures to prevent a patient with this symptomology from being routinely discharged with unexplained etiology, without appropriate directives for close follow-up." The report did not mention HCA.

The Hospital objected to Dr. Patterson's expert report and moved to dismiss Joseph's claims. *See id.* § 74.351(b). Following a hearing, the trial court overruled the Hospital's objections and denied its motion to dismiss. The Hospital then perfected this interlocutory appeal. *See id.* § 51.014(a)(9) (allowing appeal from order denying Section 74.351(b) motion).

5

## II. Analysis

### A.      TMLA expert reports, generally

The TMLA requires healthcare-liability claimants to serve an expert report on each defendant not later than 120 days after that defendant files an answer. *Abshire*, 563 S.W.3d at 223 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)). This requirement functions "to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id.*

An expert report must fairly summarize the expert's opinions regarding applicable standards of care, how the care provided failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). To opine about whether a non-physician healthcare provider such as the Hospital departed from accepted standards of care, the expert must be "qualified to testify under the requirements of Section 74.402." *Id.* § 74.351(r)(5)(B). Section 74.402 in turn provides that a person may qualify as an expert on the healthcare provider's departure from standards of care only if the person knows about accepted standards of care for the healthcare provider's diagnosis, care, or treatment of the condition involved and is qualified on the basis of training or experience to offer an expert opinion about those care standards. *Id.* § 74.402(b)(2), (3).

In deciding whether an expert is qualified based on training or experience, the trial court considers whether the witness

6

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c).

The expert's qualifications cannot be inferred but must appear in the report or in the expert's CV. *See Jacksboro Nursing Operations, LLC v. Norman*, No. 02-20-00262-CV, 2021 WL 1421431, at *4 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.); *Savaseniorcare Admin. Servs., L.L.C. v. Cantu*, No. 04-14-00329-CV, 2014 WL 5352093, at *2 (Tex. App.—San Antonio Oct. 22, 2014, no pet.) (mem. op.).

Concerning the standard of care and how to adequately identify it, the report "must set forth 'specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)). "While the [TMLA] requires only a 'fair summary' of the standard of care and how it was breached, 'even a fair summary must set out what care was expected, but not given.'" *Id.* (quoting *Palacios*, 46 S.W.3d at 880).

Regarding causation, the report must "explain 'how and why' the alleged negligence caused the injury in question." *Id.* at 224. Conclusory descriptions of causation are not adequate; "the expert must explain the basis of his statements and link conclusions to specific facts." *Id.* But "[i]n satisfying th[e] 'how and why'

7

requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be prove[d].'" *Id.* (quoting *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017)). Further, "[t]he sufficiency of the expert report's causation statement should be viewed in the context of the entire report." *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. L.M.*, No. 02-17-00147-CV, 2018 WL 1095746, at *7 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op.). Finally, "the detail needed to establish a causal link generally is proportional to the complexity of the negligent act giving rise to the claim." *Id.* In other words, a "causation opinion is not conclusory simply because it is not complex." *Id.*

A motion to dismiss based on the inadequacy of a Chapter 74 report can be granted only "if it appears to the court, after hearing, that the report does not represent an objective good[-]faith effort to comply" with the statute's definition of an "expert report." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6). The Texas Supreme Court has held that a good-faith effort involves "(1) informing the defendant of the specific conduct called into question and (2) providing a basis for the trial court to conclude the claims have merit." *Abshire*, 563 S.W.3d at 223 (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). "'[A] report that merely states the expert's conclusions about the standard of care, breach, and causation' is insufficient." *Id.* (quoting *Palacios*, 46 S.W.3d at 877). A report need not meet the standards of summary-judgment evidence. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d

8

510, 517 (Tex. 2017) ("We remain mindful that an 'adequate' expert report 'does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 556 n.60 (Tex. 2011))).

We apply an abuse-of-discretion standard in evaluating the trial court's decision to grant or deny a motion to dismiss challenging an expert report's adequacy. *Abshire*, 563 S.W.3d at 223. Our review is limited to the information contained within the four corners of the report. *Id.* We defer to the trial court's factual determinations if the evidence supports them but review its legal conclusions de novo. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Gonzales*, No. 02-16-00433-CV, 2017 WL 2375770, at *4 (Tex. App.—Fort Worth June 1, 2017, no pet.) (mem. op.). Although an abuse occurs if the trial court rules without reference to guiding rules or principles or renders a decision lacking support in the case's facts or circumstances, an abuse does not occur just because a trial court decides a matter differently than we might have. *Id.*

### B.    Dr. Patterson's qualifications[6]

Dr. Patterson's report states that he is a licensed physician "currently in the active practice of Adult Cardiology"; is board-certified in the field of cardiovascular medicine; is chancellor and a professor of medicine at the University of Arkansas

---

[6] Dr. Patterson's report includes his qualifications to opine about the care provided by Irene's cardiologist, who was not a Hospital employee; we focus here only on the report's and CV's contents as they relate to Dr. Patterson's qualifications to opine about the Hospital and its alleged direct liability for Irene's death.

9

School for Medical Sciences in Little Rock; has over twenty years' experience of clinical practice and teaching at various medical schools as a professor of cardiology; has "significant experience in both clinical practice and hospital administration" that makes him "qualified to render an opinion as to the standard of care for" the Hospital; has been physician-in-chief of the University of North Carolina Center for Heart and Vascular Care, executive director of UNC McAllister Heart Institution, and chief of the cardiology division at UNC Chapel Hill; and has "an extensive background in the development, implementation[,] and enforcement of safe, appropriate[,] and efficacious cardiovascular care pathways as well as guideline and policy development for optimal interventional clinical care for hospital cardiovascular treatment."[7] Dr. Patterson's CV reflects that he also spent four years as senior vice president and chief operating officer at Weill-Cornell Medical Center and Komansky Children's Hospital/New York Presbyterian Hospital.

---

[7]The entirety of this portion of the report states:

> Furthermore, with significant experience in both clinical practice and hospital administration, I am also qualified to render an opinion as to the standard of care for Medical City Arlington. As physician-in-chief of the UNC Center for Heart and Vascular Care, Executive Director of UNC McAllister Heart Institute and Chief of the Division of Cardiology at the University of North Carolina at Chapel Hill, as well as Chancellor and Professor of Medicine at the University of Arkansas for Medical Sciences, I have an extensive background in the development, implementation[,] and enforcement of safe, appropriate[,] and efficacious cardiovascular care pathways as well as guideline and policy development for optimal interventional clinical care for hospital cardiovascular treatment.

10

The Hospital argues that this background does not establish Dr. Patterson's qualifications to offer an opinion either about the standard of care applicable to the Hospital (including what its policies and procedures should be concerning a "triple rule out" protocol) or about causation. Based on our precedents, we must agree.

Before explaining those precedents, we first note that our sister court in Dallas recently reached the opposite conclusion about Dr. Patterson's qualifications.[8] *Decker v. Columbia Med. Ctr. of Plano, Subsidiary, L.P.*, No. 05-19-01508-CV, 2020 WL 6073880 (Tex. App.—Dallas Oct. 15, 2020, pet. denied) (mem. op.). In *Decker*, the trial court had held that Dr. Patterson was not qualified to opine about the standard of care for a hospital.[9] *Id.* at *1. But the Dallas court reversed:

> Patterson's report and curriculum vitae demonstrate he is qualified to opine about the standard of care applicable to [Columbia Medical Center of Plano dba Medical City Plano and HCA]. He is licensed to practice medicine in several states, board certified in cardiovascular medicine, actively engaged in the practice of . . . cardiology, and is a Professor of Cardiology. *See* Tex. Civ. Prac. & Rem. Code § 74.402(c). Additionally, he has experience in hospital

[8]"[W]hile we respect our sister courts' decisions, we are not bound by their precedent." *P.C. ex rel. C.C. v. E.C.*, 594 S.W.3d 459, 464 (Tex. App.—Fort Worth 2019, no pet.).

[9]Although the Dallas court did not detail Dr. Patterson's opinions about the ways in which that hospital had allegedly failed to satisfy the standard of care, Joseph's post-submission letter brief bringing *Decker* to our attention stated that Dr. Patterson had described the same failure to have the "triple rule out" protocol in place and had described his qualifications exactly as he did here. The Hospital's response to Joseph's letter brief did not take issue with either of those representations, and because the same law firms represented the opposing parties in *Decker* as in this case, we assume that Joseph has correctly characterized Dr. Patterson's *Decker* report.

11

administration, and his background includes "the development, implementation and enforcement of safe, appropriate and efficacious cardiovascular care pathways as well as guidelines and policy development for optimal interventional clinical care for hospital cardiovascular treatment."

*Id.* at *3 (concluding that Patterson's training and experience qualified him to opine about "a hospital's policies and procedures with respect to the treatment of cardiology patients").

Despite the Dallas court's holding, our own precedents and a close look at the wording of Dr. Patterson's report compel us to conclude that although he certainly knows how to treat cardiology patients as a clinician, his report and CV do not show that he has the requisite familiarity with or experience in developing, implementing, and enforcing hospital policies and procedures.

For example, in a direct-liability claim involving a patient who died from complications after a hysterectomy, we analyzed a board-certified OB-GYN's qualifications to opine on a hospital's standard of care for its post-surgery recovery-room nurses. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, No. 02-10-00342-CV, 2011 WL 3211239 (Tex. App.—Fort Worth July 28, 2011, no pet.) (mem. op. on reh'g). Although the expert was qualified when it came to how nurses should treat post-op patients,[10] the same could not be said for his opinions about the hospital

---

[10]The physician was familiar with the standard of care for treating patients like the deceased, had cared for hundreds of similar patients, and was "familiar with the standards of care for recovery room and post-operative nurses caring for patients like Mrs. Alvarez through his experience working with those nurses." *Alvarez*,

itself. The report "d[id] not establish" that the expert had "any familiarity, training, or experience that would allow him to opine as to the standard of care for a hospital in formulating training programs, formulating or enforcing its policies and procedures, or supervising its nurses," *id.* at *5 (citing *Hendrick Med. Ctr. v. Conger*, 298 S.W.3d 784, 788 (Tex. App.—Eastland 2009, no pet.))—those were matters involving an "entirely separate" standard of care from that applicable to recovery-room nursing care, *id.* (citing *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950–51 (Tex. App.—Fort Worth 1997, pet. denied)). We wrote:

> Although Dr. Tyuluman's report states that he has served as chairman of a hospital quality improvement committee and a member of a clinical case review committee, nowhere in the report does he state that as a result of this or other experience he is familiar with the standard of care for a reasonable, prudent hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses. The report does not indicate that, as a result of his committee service, Dr. Tyuluman gained experience in formulating, implementing, or monitoring either hospital nurses' training or enforcement of hospital policies and procedures or hospital nurses' supervision.

*Id.*

The same was true in another of our cases, *Texas Health Harris Methodist Hospital Fort Worth v. Biggers*, Nos. 02-12-00486-CV, 02-13-00040-CV, 2013 WL 5517887 (Tex. App.—Fort Worth Oct. 3, 2013, no pet.) (mem. op.). *Biggers* arose out of an

---

2011 WL 3211239, at *4. We thus affirmed that vicarious-liability claims against the hospital that employed the nurses could proceed. *Id.* Here, in contrast, Joseph has not alleged that the Hospital's nursing staff was negligent, nor has he raised any other type of vicarious-liability claim.

13

emergency craniectomy in which part of the patient's skull was temporarily removed to relieve pressure and allow for brain surgery following a car crash, but because the removed portion was improperly stored and thus could not be reattached, the patient ended up with artificial implants that led to repeated infections and additional surgeries. *Id.* at *1. Among other defendants, the plaintiffs sued Harris Methodist Hospital and Community Tissue Services—a "bone bank," or "tissue bank," that preserves such things as bone material for later use, *id.* at *5—and provided a Chapter 74 report from an orthopedic surgeon. *Id.* at *1.

We sustained Harris Methodist's and Community's challenges to the expert's qualifications. As to the hospital, although the expert had extensive surgical experience involving bone and tissue grafts, he did not state whether he had "worked or interacted with hospital staff to preserve and store tissue or that he ha[d] any knowledge of hospital procedures beyond a cursory statement that he [was] 'fully familiar with standards of care that involve preservation of tissue and storing of tissue by . . . hospitals.'" *Id.* at *4. The report contained "nothing . . . from which a trial court could conclude that he is familiar with the standards of care for hospitals." *Id.* Similarly, nothing indicated that the expert was familiar with the standard of care for a tissue bank like Community. *Id.* He did not state that he had "any knowledge or experience with the cleaning or storage procedures of tissue banks and whether they differ from those of a hospital or with the transfer procedures from the hospital to the tissue bank." *Id.*

14

And although it involved a summary judgment rather than a Chapter 74 challenge, yet another of our cases informs how we analyze Dr. Patterson's qualifications here: *Reed v. Granbury Hospital Corp.*, 117 S.W.3d 404 (Tex. App.—Fort Worth 2003, no pet.). There, a hospital was sued for failing to have protocols for administering tPA[11] to stroke patients, and in support of the plaintiffs' claims, an ER doctor and a neurologist each submitted an affidavit and was deposed concerning the hospital's alleged administrative negligence for that failure. *Id.* at 410–12.

Affirming summary judgment for the hospital after the trial court struck the doctors' standard-of-care testimony, we first held that although the ER doctor might have been qualified to opine about the standard of care applicable to a *physician's* decision about whether to administer tPA, the record did not show that the doctor "possessed any special knowledge about what protocols, policies, or procedures a hospital of ordinary prudence, with the Hospital's capabilities, would have had in place." *Id.* at 411. We next discussed the neurologist and held that he, too, was not qualified to opine about hospitals' tPA protocols. *Id.* at 411–12. Even though the neurologist had treated hundreds of stroke patients, had administered tPA to many of them, and had "participated in the creation of a hospital protocol in stroke

---

[11]Tissue plasminogen activator, or tPA, breaks up blood clots and can improve patient outcomes if administered within three hours of stroke symptoms' onset. *Reed*, 117 S.W.3d at 407 & n.1.

15

pathways"[12] that he described as an area similar to tPA therapy, he was unfamiliar "with hospital protocols for the administration of tPA to stroke patients, with the possible exception of the hospitals in which he practiced." *Id.*

Dr. Patterson's report suffers from the same deficiencies we found in *Alvarez*, *Biggers*, and *Reed*. Although he writes that he has "an extensive background in the development, implementation[,] and enforcement of safe, appropriate[,] and efficacious cardiovascular care pathways as well as guideline and policy development for optimal interventional clinical care for hospital cardiovascular treatment," Dr. Patterson does not describe or connect the dots between clinical pathways he has developed and the "triple rule out" protocol for which he advocates in this case—or even whether his work has been in the context of developing administrative, hospital-specific policies and procedures. Nor does his report detail his claimed "significant experience" in "hospital administration," much less in a way that qualifies him to

---

[12]In the medical profession, a clinical pathway—whether for evaluating and treating strokes, heart attacks, stomachaches, or anything else—is

> a multidisciplinary management tool based on evidence-based practice for a specific group of patients with a predictable clinical course, in which the different tasks (interventions) by the professionals involved in the patient care are defined, optimized[,] and sequenced either by hour (ED), day (acute care)[,] or visit (homecare). Outcomes are tied to specific interventions.

*See Clinical pathway*, Wikipedia, https://en.wikipedia.org/wiki/Clinical_pathway (last visited Nov. 1, 2021). A particular clinical pathway "tries to capture the foreseeable actions which will most commonly represent best practice for most patients most of the time." *Id.*

opine on the standard of care for the Hospital; his duties as physician-in-chief of UNC's Center for Heart and Vascular Care, as executive director of UNC's McAllister Heart Institution, as chief of the cardiology division at UNC Chapel Hill, and as senior VP and COO at Weill-Cornell Medical Center and Komansky Children's Hospital/New York Presbyterian Hospital are not explained in his report or CV.

Bound as we are to discern Dr. Patterson's qualifications only from within the four corners of his report and CV, *e.g.*, *Jacksboro Nursing*, 2021 WL 1421431, at *4, we cannot find or infer from either document any familiarity with hospital-specific administrative standards of care that would qualify him to opine about proper testing and diagnosis, about the "triple rule out" protocol, or about discharge policies. Indeed, although his report states—quite accurately, it seems—that he is "familiar with the evaluation and treatment of cardiac patients with clinical presentations similar to" Irene, he does not state that he is similarly familiar with how *hospitals* develop and put into place (or should put into place) the policies and procedures he outlines.[13] *See Alvarez*, 2011 WL 3211239, at *5 (holding that report was deficient where physician did not state that as a result of his service as chair of hospital quality-improvement committee and as member of clinical case-review committee he had become "familiar

---

[13]Joseph's brief recites that "Dr. Patterson states that he is familiar with not only his practice area (cardiology) but also hospital protocols for the evaluation and treatment of cardiac patients who present at a hospital with clinical symptoms similar to [Irene]." But the report does not say that, and the record citation for this statement is to a page number outside the range of the clerk's record's 424 pages.

with the standard of care for a reasonable, prudent hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses" or that his committee service had produced "experience in formulating, implementing, or monitoring either hospital nurses' training or enforcement of hospital policies and procedures or hospital nurses' supervision"); *cf. Biggers*, 2013 WL 5517887, at *4 (holding that "cursory statement" that physician was "'fully familiar with standards of care that involve preservation of tissue and storing of tissue by . . . hospitals'" was not enough to establish his qualifications to opine about those standards).

We conclude that Dr. Patterson's report and CV fail to establish his qualifications to opine about standards of care relating to the Hospital's policies and procedures (or lack thereof) concerning a patient such as Irene. And from this conclusion, it flows logically that Dr. Patterson has similarly failed to establish his qualifications to opine about causation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C), (r)(6) (in connection with causation, defining "expert report" as one prepared by an expert qualified under the Texas Rules of Evidence to opine about the causal relationship between injury and departure from applicable standard of care and fairly summarizing expert's opinion about the "causal relationship between that failure and the injury, harm, or damages claimed"); *cf., e.g., Whisenant v. Arnett*, 339 S.W.3d 920, 927 (Tex. App.—Dallas 2011, no pet.) (holding that if physician is qualified to offer expert opinion on standard of care, trial court can reasonably conclude that expert is also qualified to opine on causation). We do agree with Joseph that Dr.

18

Patterson is qualified to opine that the cause of his wife's death was untreated pulmonary embolism. But beyond that, Dr. Patterson does not explain how he is qualified to opine that the Hospital's alleged breach of some administrative policy-and-procedure standards of care proximately caused Irene's death.

We sustain the Hospital's first issue.

## C.      Conclusory nature of Dr. Patterson's opinions

The Hospital alternatively argues that the opinions in Dr. Patterson's report concerning the standards of care, their breach, and causation are all conclusory, and thus the report is deficient under the TMLA.[14] We agree.

Joseph's direct-liability claims—that the Hospital allegedly violated the standards of care (1) by failing to have a "triple rule out" protocol, or policies and procedures to ensure that a patient like Irene is properly evaluated, diagnosed, and treated, and (2) by allowing a patient like Irene to be discharged—all implicate the practice of medicine. But "[a] hospital cannot practice medicine and therefore cannot

---

[14]The Hospital's second issue includes an assertion that Dr. Patterson's conclusory opinions "do not constitute an objective good[-]faith effort to comply with the section 74.351 requirements," which if true would authorize us to render judgment in the Hospital's favor. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*) (stating that court must grant motion challenging adequacy of expert report "only if it appears to the court, after hearing, that the report does not represent an objective good[-]faith effort to comply with the definition of an expert report"); *see, e.g., Patel v. Harmon*, 213 S.W.3d 449, 451–52 (Tex. App.—Eastland 2006, no pet.) (holding that expert report did not constitute good-faith effort and rendering judgment dismissing plaintiff's claims). The Hospital has asked us only to reverse and remand and does not seek a judgment from us dismissing Joseph's claims for want of a good-faith effort.

be held directly liable for any acts or omissions that constitute medical functions." *Reed*, 117 S.W.3d at 415. If such things as establishing administrative polices on ordering particular tests and discharging patients *aren't* medical functions, an expert purporting to pin direct rather than vicarious blame on a hospital for a policy or protocol failure should reasonably be expected to explain how his opinions do not implicate the practice of medicine, even at this preliminary stage.

As the Hospital points out, diagnosing and treating illness is the practice of medicine, which is solely a physician function. *See*, *e.g.*, *Zamarripa*, 526 S.W.3d at 461 n.36 (noting that Texas law prohibits nurses from practicing medicine, which is statutorily defined as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder . . . or injury . . ." (quoting Tex. Occ. Code Ann. § 151.002(a)(13))); *Drs. Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016) (explaining that although hospital is institution licensed to provide healthcare, only licensed physician can give medical care); *Sanchez v. Martin*, 378 S.W.3d 581, 596 (Tex. App.—Dallas 2012, no pet.) (explaining that hospitals have no duty to disclose medical or surgical risks or to obtain informed consent to surgery because that is a "nondelegable duty imposed solely upon the treating doctor") (quoting *Espalin v. Child.'s Med. Ctr.*, 27 S.W.3d 675, 686 (Tex. App.—Dallas 2000, no pet.)); *see also* Tex. Occ. Code Ann. §§ 155.001–.003 (establishing that only a "person" can be licensed to practice medicine).

*Zamarripa* involved a pregnant patient who died while being transferred to a second hospital at her treating physician's directive. 526 S.W.3d at 456–57. The deceased's minor children's guardian sued Valley Regional (the original hospital) and others. The plaintiff claimed that Valley Regional's nurses negligently allowed the patient to be discharged when she was not suitable for discharge and that hospital personnel negligently allowed a ground ambulance transfer when the patient should not have been transferred. *Id.* at 457. In addition to providing a nurse's expert report on nursing standards of care, Zamarripa provided a physician's expert report on causation[15]—that is, on foreseeability and cause-in-fact. *Id.* at 460. But the supreme court held that the physician's report was deficient:

> [Dr.] Harlass . . . stated only that by "permitting and facilitating the transfer," Valley Regional caused Flores to be in an ambulance when she suffered a placental abruption and cardiac arrest, leading to her death. But as Harlass himself explains, it was Dr. Ellis [Flores's treating physician] who ordered Flores's transfer, not Valley Regional. Harlass does not explain *how* Valley Regional permitted or facilitated Flores's transfer, or even whether Valley Regional had any say in the matter. . . . Neither [the nurse expert] nor Harlass explains how Valley Regional had either the right or the means to persuade Dr. Ellis not to order the transfer or to stop it when he did.
>
> Zamarripa's response is that the Act does not require such explanations in expert reports. But without factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which we have held are clearly insufficient.

*Id.* at 461.

---

[15]A causation expert must be a physician. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C).

21

In addition, as we know from *Palacios*, "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." 46 S.W.3d at 880. Dr. Patterson's report does not identify who at the Hospital could have overridden or second-guessed the medical decisions of Irene's treating physicians, or how any Hospital employee or administrator could have done so without improperly engaging in the corporate practice of medicine. And even though hospitals can and do implement a variety of policies and procedures without "practicing medicine," Dr. Patterson's opinions as written describe things that only physicians can do: ordering tests, making diagnoses, discharging patients, and the like. The report is thus conclusory about the standards of care applicable to the Hospital and the breach of those standards.

The report is also conclusory on proximate cause. Dr. Patterson opined that the "multiple failures" by Irene's cardiologist and the Hospital "made it highly foreseeable that significant injury or death could result." He then stated that the "severity of this collective diagnostic miss evidences failures by an unsafe system, unsafe practice environment[,] and unsafe clinicians proceeding with high risk, and therefore, unsafe care." Dr. Patterson described it as "imperative" for the treating physician to "take the appropriate steps, and for [the Hospital] to have procedures in place, to ensure pulmonary embolism was ruled out as a potential underlying etiology," but this "life-threatening condition was not appropriately assessed,

22

monitored, diagnosed[,] and treated, which greatly increased the risk of a fatal thromboemboli event, which ultimately occurred."

Joseph maintains that Dr. Patterson's report satisfies *Abshire* by "drawing a line" directly from the Hospital's failure to implement the "triple rule out" protocol, to the failure to diagnose the pulmonary embolism, to Irene's ultimately injury. *See* 563 S.W.3d at 226 (holding that expert report satisfied causation requirement by directly linking nurses' failure to properly document patient's medical history to patient's delayed treatment and subsequent injury). It's true that *Abshire* held that an expert "need not prove the entire case or account for every known fact" and that a report is sufficient if it makes a good-faith effort to explain, factually, how proximate cause will be proved. *Id.* at 224. Still, though, as the Hospital points out, *Abshire* also reiterated that an expert must explain "how and why" the alleged negligence caused the injury in question. *Id.* Dr. Patterson does not explain how and why Hospital policies, procedures, and protocols—which can be implemented only through its nurses and staff—could have changed what the *physician* did in ordering tests, making his diagnosis, and discharging Irene when she was in stable cardiac condition. *See Zamarripa*, 526 S.W.3d at 461 (holding that expert's failure to explain how hospital could have countermanded doctor's transfer orders rendered report nothing more than insufficient *ipse dixit*).

We sustain the Hospital's second issue.

23

### III. Conclusion

Having sustained Medical City Arlington's and HCA's first two issues, we reverse the trial court's order overruling their objections to the expert report of Dr. Cam Patterson and denying their motion to dismiss, and we remand the case to the trial court so that it can consider whether to grant a 30-day extension to cure the report's deficiencies. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: November 4, 2021

24